[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10276

_____

MICHELE YATES,

Plaintiff-Appellee,

*versus*

PINELLAS HEMATOLOGY & ONCOLOGY, P.A.,

Defendant-Appellant,

PRATIBHA DESAI,
an individual,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:16-cv-00799-WFJ-CPT

_____

Before JORDAN, NEWSOM, and TJOFLAT, Circuit Judges.

JORDAN, Circuit Judge:

The jury in this qui tam case found that Pinellas Hematology & Oncology violated the False Claims Act, 31 U.S.C. § 3729 et seq., on 214 occasions, and that the United States had sustained $755.54 in damages. Following that verdict, the district court trebled the damages and imposed statutory minimum penalties of $1,177,000 ($5,500 for each of the 214 violations).

On appeal, Pinellas challenges the admission of an exhibit, the jury's verdict on liability and damages, and the monetary award imposed by the district court. After a review of the record, and with the benefit of oral argument, we affirm in part and dismiss in part.

I

We summarize the facts in the light most favorable to the jury's verdict. See Royal Palm Properties, LLC v. Pink Palm Properties, LLC, 950 F.3d 776, 782 (11th Cir. 2020).

## A

Pinellas was a medical practice owned by Dr. Pratibha Desai. During the relevant period, Pinellas' headquarters and primary office were located on Park Street in Saint Petersburg, Florida. We refer to this location as Park Place.

Park Place had a clinical laboratory at which, among other things, Pinellas would draw blood from patients and run laboratory tests on those blood samples. For patients who had Medicare coverage, Pinellas would seek reimbursement from the federal government for those tests.

In April of 2015, Pinellas purchased an oncology practice that was located at Bayfront Hospital in Saint Petersburg, Florida. We refer to this practice, which also had its own clinical laboratory, as Bayfront.

Under the Clinical Laboratory Improvement Amendments of 1988 and its regulations, no laboratory can conduct tests on materials derived from the human body unless it has the proper CLIA certificate. *See* 42 U.S.C. § 263a(b); 42 C.F.R. §§ 493.1, .3(a), .15, .43–49; Center for Medicare and Medicaid Services, Medicare Claims Processing Manual, § 70.1 (2020). Both Park Place and Bayfront had the appropriate CLIA certificates prior to the purchase of Bayfront, but Bayfront's CLIA certificate did not transfer to Pinellas. Because each laboratory location must have its own CLIA certificate, *see* 42 C.F.R. § 493.43(a), Pinellas could not use either of the preexisting CLIA certificates to perform its laboratory tests at

Bayfront. Pinellas instead had to obtain a new CLIA certificate for Bayfront linking the latter to it.[1]

The problem for Pinellas was that it did not have the proper CLIA certificate for Bayfront from April of 2015 until March of 2016, but it still performed tests at Bayfront during that time. The bigger problem for Pinellas was that it then submitted reimbursement claims to Medicare for those tests. And the biggest problem for Pinellas was that when Medicare rejected those claims, it altered the relevant information and resubmitted them—twice.

Michele Yates, Pinellas' billing manager, filed a qui tam action against Pinellas and Dr. Desai. She alleged that they had violated the FCA by defrauding the United States through the submission of the Bayfront reimbursement claims to Medicare and by retaliating against her for attempting to stop their fraudulent conduct. The United States chose not to intervene. *See* 31 U.S.C. § 3730(b)(2).

Before trial, Pinellas filed a motion in limine to exclude Exhibit 24, a spreadsheet prepared by Ms. Yates which summarized

---

[1] The parties debate whether Bayfront's preexisting CLIA certificate could be transferred to Pinellas or whether Pinellas had to obtain a new CLIA certificate for Bayfront. In our view, the particular method of obtaining a CLIA certificate for Bayfront linked to Pinellas does not matter. Whether through a transfer or a brand-new application, Bayfront was required to have a CLIA certificate linked to Pinellas, and it did not have one from April of 2015 until March of 2016.

some of the allegedly fraudulent claims submitted to Medicare. The district court denied Pinellas' motion without prejudice.

At trial, Ms. Yates told the jury that, between April and July of 2015, Pinellas had billed Medicare over 2,000 times for laboratory tests performed at Bayfront. Because Bayfront did not have a CLIA certificate at that time, those initial claims did not include a CLIA certificate number. As a result, Medicare denied those claims.

To have Medicare pay the claims, Pinellas altered the information on the claim forms to make it seem as if the laboratory tests had been conducted at Park Place, which did have a valid CLIA certificate linked to Pinellas. When it first resubmitted the claims, Pinellas added Park Place's CLIA certificate number to the Bayfront claim forms. Medicare, however, also denied that second set of claims. So, Pinellas resubmitted the claims once again, this time changing the location of service from Bayfront's address to Park Place's address. Medicare paid some of the claims from the third set.

Documentary evidence corroborated Ms. Yates' testimony. For instance, a May 9, 2015, internal email from Lia Valentin, a Pinellas billing assistant, to Ms. Yates and others read as follows:

> Michel[e], I just wanted to remind you that the claims with medicare that have labs in them the location has to be switched to pinellas park because the claim are denying until we have the clia fixed for the bayfront

office location. Im correcting the claims that came back that did not get paid & refiling them.

D.E. 201-3 at 2.

Another email sent by Ms. Valentin, on July 14, 2015, stated:

I verify we have not yet added bayfront office . . . to Dr. Desai['s] Clia number. the only two offices that are currently ok with the Clia number is park place & largo. For now any denial we receive we change the place of address to Pinellas park address and refile the claim to medicare. [T]hat way we can get the lab paid.

D.E. 201-4 at 5.

Ms. Yates moved during trial to introduce Exhibit 24—the spreadsheet—into evidence, and Pinellas did not object. She testified that Exhibit 24 showed that Pinellas had submitted 214 claims for Bayfront laboratory tests with Park Place's CLIA certificate number and had changed the location of service to Park Place's address. Out of that total, Medicare paid 64 claims totaling $755.54.[2]

---

[2] Ms. Yates testified that all 214 claims included in Exhibit 24 had the location of service changed to Park Place's address. Our review of the few claim forms that are in the record on appeal, however, confirms that that is not the case. Though all the available claim forms include Park Place's CLIA certificate number, some did not have the location of service changed to Park Place's address. We note this discrepancy but do not address its implications, if any, because the insertion of Park Place's CLIA certificate number by itself is sufficient to constitute a false certification under the FCA.

## B

The jury found Dr. Desai not liable. As to Pinellas, the jury found it liable for having knowingly submitted 214 materially false claims to Medicare, thereby violating the FCA. The jury also found that the United States had suffered $755.54 in damages.

Following the verdict, Pinellas filed a renewed motion for judgment as a matter of law and/or remittitur under Rules 50(b) and 59(e) of the Federal Rules of Civil Procedure. In its motion and subsequent filings, Pinellas argued that the evidence presented at trial was insufficient to support the jury's verdict. Pinellas also asserted that, for various reasons, discrete claim subsets should be deducted from the 214 claims for which the jury had found it liable. In the alternative, Pinellas moved for remittitur, submitting that the damages and statutory penalties mandated by the FCA constituted an excessive fine in violation of the Eighth Amendment.

The district court denied Pinellas' renewed motion. It found that the evidence, though contested, was sufficient to support the jury's verdict. As to the damages and statutory penalties, the FCA mandated the imposition of treble damages and statutory penalties of between $5,500 and $11,000 per false claim. *See* 31 U.S.C § 3729(a)(1); 28 C.F.R. § 85.3(a)(9). Accordingly, the court imposed a total monetary award of $1,179,266.62—composed of (i) treble damages of $2,266.62 (3 x $755.54), and (ii) the lowest permissible statutory penalty of $1,177,000.00 (214 x $5,500). Though noting that the amount was "very harsh," the court ultimately held that it

did not violate the Eight Amendment's prohibition on excessive fines.  *See* D.E. 227 at 3–4.

On appeal, Pinellas challenges the district court's admission of Exhibit 24, the jury's verdict on liability and damages, and the total monetary award.  We address each argument below.

## II

Pinellas argues that, for various reasons, the district court abused its discretion in admitting Exhibit 24 at trial.  Ms. Yates responds that Pinellas failed to preserve its objection, which in any event lacks merit.  We agree with Ms. Yates on the first point.

To preserve a claim that a district court improperly admitted evidence, a party must make a timely objection.  *See* Fed. R. Evid. 103(a)(1)(A).  That objection can come before or during trial, and once the district "court rules definitively on the record . . . a party need not renew [its] objection . . . to preserve a claim of error for appeal."  Fed. R. Evid. 103(b).  When the objection comes in the form of a motion in limine before trial, a district court makes a definitive ruling if its decision is final or with prejudice; conversely, if the court's ruling is tentative or without prejudice, there is no definitive ruling on the objection.  *See Tan Lam v. City of Los Banos*, 976 F.3d 986, 1005 (9th Cir. 2020); 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 103.11[2][b] (2d ed. 2021).  In the latter scenario, the objecting party must renew its objection at trial to preserve a claim of error for appeal.  *See United*

20-10276                Opinion of the Court                9

*States v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015); *Tan Lam*, 976 F.3d at 1006.

When a party fails to preserve an evidentiary objection, we review the district court's admission of evidence for plain error. *See Wilson*, 788 F.3d at 1313. To reverse under plain error review, we must find an error that is plain and that has affected the objecting party's substantial rights. *See United States v. Olano*, 507 U.S. 725, 733–34 (1993); *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015). "Once those three conditions have been met," we ask whether the forfeited error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1905 (2018) (internal quotation marks omitted). Our ultimate decision under plain error review is discretionary. *See* Fed. R. Evid. 103(e) ("A court *may* take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved.") (emphasis added); *United States v. Marcus*, 560 U.S. 258, 262 (2010) (explaining that under plain error review, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates" that the required elements are met).

In this case, Pinellas objected to the admission of Exhibit 24 through a motion in limine. The district court denied that motion without prejudice, meaning that its ruling was not definitive. Pinellas was accordingly required to renew its objection to the admission of Exhibit 24 at trial when Ms. Yates moved for its

admission. Pinellas did not do so, and thus failed to preserve its claim of error for appeal. *See Wilson*, 788 F.3d at 1313.

As a result, we would generally review the admission of Exhibit 24 for plain error. But, as noted, reversal for plain error is discretionary. And because the onus to demonstrate plain error is on the party challenging the evidentiary ruling, we have in the past declined to conduct a plain error analysis sua sponte when that party makes no effort to satisfy the standard. *See United States v. Gari*, 572 F.3d 1352, 1362 (11th Cir. 2009).

On appeal, Pinellas was put on notice of its failure to preserve its claim of error by Ms. Yates, but it has chosen not to argue in the alternative that the admission of Exhibit 24 constituted plain error. Instead, Pinellas argues (incorrectly) only that it preserved its claim of error below. As Pinellas has not argued that the admission of Exhibit 24 rose to the level of plain error, we decline to construct that argument for Pinellas and then rule on it. We therefore affirm the district court's admission of Exhibit 24.

## III

Pinellas' challenge to the jury's verdict comes to us, for the most part, from the district court's denial of the renewed motion for judgment as a matter of law. Therefore, except where otherwise noted, "[w]e review the district court's decision *de novo*, applying the same standard that court applied." *Royal Palm*, 950 F.3d at 782. Under that standard, our task is to determine whether the record—viewed in the light most favorable to Ms. Yates (the

prevailing party)—points so overwhelmingly in favor of Pinellas that the jury's verdict cannot stand. *See id.* Stated differently, the verdict will be set aside only if no reasonable jury could have arrived at it. *See id.*

## A

Enacted in 1863 to combat fraud perpetrated against the Union Army during the Civil War, the FCA has become the United States' "primary litigative tool for combatting fraud." S. Rep. No. 99-345, at 2, 4 (1986). Before delving into the merits of Pinellas' challenge to the jury's verdict, we provide a brief overview of §§ 3729(a)(1)(A) and (a)(1)(B), the relevant provisions of the FCA.

Through § 3729(a)(1)(A), the FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." And § 3729(a)(1)(B) imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

Pinellas' challenge to the jury's verdict on liability takes aim at the three elements shared by both provisions: the existence of a false claim or statement, the materiality of that false claim or statement, and scienter. *See United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). Pinellas also asks us to overturn the jury's verdict on damages because, it says, the United States suffered no harm.

## B

Turning first to Pinellas' argument on the falsity element, we note that the FCA does not define the term "false." Case law, however, has identified various types of false claims and statements. For example, a claim is false when it misrepresents the goods or services provided. *See United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94 (3d Cir. 2018); *United States ex rel. Thomas v. Black & Veatch Spec. Projects Corp.*, 820 F.3d 1162, 1168 (10th Cir. 2016); *United States v. Sci. Applications Intern. Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010). A claim is also false when a person or entity fails to comply with statutory, regulatory, or contractual requirements but certifies that it has complied with them. *See Universal Health Services Inc., v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016); *Phalp*, 857 F.3d at 1154.

Ms. Yates based her FCA claims on a false certification theory. She asserted that Pinellas falsely certified that it complied with the CLIA's requirement that a laboratory possess the proper CLIA certificate to conduct, and bill for, laboratory tests. Pinellas, she claimed, did that by adding Park Place's CLIA certificate number and address to Medicare reimbursement claims for laboratory tests conducted at Bayfront.

In its brief on appeal, Pinellas argues that none of the claims it submitted to Medicare is false. According to Pinellas, the unpaid claims are not false because "they did not list any CLIA [certificate] number on the claims form." Appellant's Br. at 37. As to the paid

20-10276          Opinion of the Court          13

claims, Pinellas contends that they are not false because they are not material.  Both arguments fail.

First, Pinellas does not point to any evidence to support its argument that none of the unpaid claims is false.  Its single citation is to an explanation of a benefits form that, as best we can tell, was not introduced at trial.  Moreover, we see no indication that this form relates to any of the 214 claims on which the jury found Pinellas liable.  And even if the form did correspond to one of the claims, the explanation of benefits would tell us nothing about the remaining 213 claims included in Exhibit 24.  Finally, the few claim forms that are in the record on appeal all include Park Place's CLIA certificate number.

Indeed, Ms. Yates testified that she created Exhibit 24 with data provided by her expert, Adam Sharp, who converted Pinellas' electronic claims data into a reimbursement form format.  According to Ms. Yates, she whittled down the reimbursement claim forms that Mr. Sharp had provided her to 214, all of which included Park Place's CLIA certificate number.

Second, we reject Pinellas' argument that the paid claims are not false because they are not material.  The falsity and materiality elements of an FCA claim are distinct and independent requirements.  A claim may be material but not false, false but not material, or both material and false.  A reasonable jury could have found that the 214 claims included in Exhibit 24 were false.

## C

We also disagree with Pinellas' arguments on the FCA's materiality element. Based on our review of the record, a reasonable jury could have found that the 214 claims included in Exhibit 24 were material to the United States' decision to pay.

The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The materiality element seeks to limit the scope of liability under the FCA to claims for which the government "would have attached importance to the violation in determining whether to pay the claim." *United States ex rel. Marsteller v. Tilton*, 880 F.3d 1302, 1313 (11th Cir. 2018). *See Escobar*, 136 S. Ct. at 2003 ("Materiality . . . cannot be found where noncompliance is minor or insubstantial."). Significantly, the materiality analysis is holistic. *See United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021). Some of the relevant, non-exhaustive factors include whether the matter is an express condition to payment; whether, to the extent the United States had actual knowledge of the misrepresentations, they had an effect on its behavior; and whether the misrepresentations went to the essence of the bargain. *See id.* Pinellas targets those factors in its appeal.

Pinellas first argues that "because the incorrect CLIA number was not a condition to payment," Ms. Yates' claims are not actionable under the FCA. *See* Appellant's Br. at 27. In support, Pinellas relies on *United States ex rel. New Mexico v. Deming Hosp.*

20-10276              Opinion of the Court                 15

*Corp.*, 992 F. Supp. 2d 1137 (D.N.M. 2013), and *United States ex rel. Hobbs v. MedQuest Associates, Inc.*, 711 F.3d 707 (6th Cir. 2013). But to the extent that Pinellas relies on the labelling of the CLIA certification requirement as one of payment, the Supreme Court in *Escobar* rejected formalism for reality. There, the Court stated that the United States' decision to label a requirement as a condition of payment is relevant but not dispositive. *See Escobar*, 136 S. Ct. at 2003. The materiality inquiry asks whether a misrepresentation would or did influence the United States' decision to pay, and neither *Deming* nor *Hobbs* helps answer that question.[3]

Deming and *Hobbs* dealt with legal requirements different from those at issue here. *Deming* involved regulations requiring hospital laboratories that were already CLIA-certified to remain in compliance with certain standards. *See Deming*, 992 F. Supp. 2d at

---

[3] We have significant doubts about Pinellas' argument that a CLIA certificate is not a condition of payment. "Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *United States ex rel. Conner v. Salina Regl. Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008). "CMS always cancels a laboratory's approval to receive Medicare payment for its services if CMS suspends or revokes the laboratory's CLIA certificate." 42 C.F.R. § 493.1842(a)(1). And Medicare's claims processing manual indicates that "[t]he CLIA mandates that virtually all laboratories, including physician office laboratories (POLs) . . . have a CLIA certificate in order to receive reimbursement from Federal programs." *See* CMS, *Medicare Claims Processing Manual*, § 70.1. Because the jury had sufficient evidence otherwise to find that Pinellas' violations were material, however, we need not decide whether CLIA certification is a condition of payment.

1148.  And the regulations at issue in *Hobbs* are unrelated to CLIA certification.  *See Hobbs*, 711 F.3d at 710–12 (considering an FCA claim based on misstatements regarding supervising physician regulations).  Therefore, *Deming* and *Hobbs* tell us little, if anything, about whether falsely stating that tests were conducted in a CLIA-certified laboratory would or did influence the United States' decision to pay Pinellas' claims.

Pinellas next argues that the United States' failure to seek reimbursement or seek sanctions once it had actual knowledge of the misrepresentations indicates that they were not material.  We agree with Pinellas that the United States' behavior after it has paid a claim, and knows of a violation, may be relevant to the materiality analysis.  *See Bibby*, 987 F.3d at 1350–51.  Yet that behavior is relevant only to the extent that it helps answer the ultimate question: whether the United States "would have attached importance to the violation in determining whether to pay the claim." *Marsteller*, 880 F.3d at 1313.  The record in this case includes other evidence on that question—e.g., Medicare's actions and Pinellas' beliefs at the time of the submission of the false claims—that is more than sufficient to uphold the jury's verdict.

Based on Ms. Yates' testimony, the May 9th and July 14th emails from Ms. Valentin, and Exhibit 24, the jury could reasonably find that the United States denied the initial Bayfront claims that lacked a CLIA certificate number; that Pinellas understood the denial of those claims to be the result of the lack of a CLIA certificate number; that, in response, Pinellas refiled those claims with Park

Place's CLIA certificate number; that Pinellas understood the denial of those refiled claims to be due to the mismatch between Park Place's CLIA certificate number and Bayfront's address; that, to obtain payment, Pinellas directed its employees to again refile the claims, this time with the location of service changed to Park Place's address, until the CLIA certificate issue was "fixed"; and that the United States paid some of those refiled claims. That evidence was enough to prove the materiality of the false certification on the 214 claims.

Moreover, Dr. Desai testified that she knew that Pinellas could not bill for Bayfront laboratory tests until the facility was properly licensed (though she claimed to be unsure of the precise type of license required and of the method for obtaining it). It was that knowledge that allegedly led her to order a hold of all Bayfront laboratory test claims. And both Dr. Desai's husband, who helped her run Pinellas, and Pinellas' office manager, Illiana Bolton, testified that they generally knew that a laboratory is required to have a CLIA certificate to bill Medicare. That testimony, though not dispositive, is also relevant to the materiality inquiry. *See Escobar*, 136 S. Ct. at 2003 (explaining that it is relevant that "the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement").

Finally, Pinellas contends that its failure to obtain a CLIA certificate for Bayfront was a minor, administrative error. In that vein, one factor in the materiality inquiry is whether the

requirement at issue goes to the essence of the bargain with the government—i.e., whether the requirement is a central part of the regulatory program. *See Bibby*, 987 F.3d at 1347–48.

According to Pinellas, what the United States would consider important in determining whether to pay its claims is that Bayfront had a preexisting CLIA certificate, and that it was providing cancer patients with laboratory tests necessary to start chemotherapy. That may be one way of looking at things, but it is not the only way. In our view, there is sufficient evidence in the record for the jury to find that the United States would find a lack of compliance with the CLIA certificate requirement important when deciding whether to pay Pinellas' claims. For example, the United States did not pay Pinellas' initially submitted claims, which lacked a CLIA certificate number, or the second set of claims, which contained Park Place's CLIA certificate number but not its address. Pinellas' internal emails—directing that, to obtain payment from Medicare, the claims would be refiled with Park Place's address— are also indicative of the importance of CLIA certification. So too is the fact that the Florida agency that regulated the CLIA program within the state closed Bayfront in October of 2015 upon learning that it had been operating without a CLIA certificate.

Pinellas relies on *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 764–65 (3d Cir. 2017), in which the Third Circuit held that minor, insubstantial misstatements did not violate the FCA. Pinellas maintains that, as in *Spay*, the United States here paid for services that were in fact provided, and that, like the Third

20-10276                Opinion of the Court                19

Circuit in *Spay*, we should hold that its misstatements are the type of minor violations that do not give rise to liability under the FCA. Pinellas, however, misreads *Spay*.

The Third Circuit's materiality determination in *Spay* was based on the fact that Medicare knew of the relevant inaccuracies and nevertheless paid the claims. *See id.* at 763–65. More precisely, the defendant in *Spay*, a pharmacy chain, submitted prescription reimbursement claims to Medicare that contained dummy pre-scriber identification numbers. *See id.* at 750–51. It did so because it often lacked the real, unique identification numbers for prescrib-ing physicians, and the electronic claims system would reject claims submitted without that unique identification number. *See id.* at 750, 764. There was no dispute that the prescriptions filled by the defendant had been issued by properly licensed prescribers. Medicare knew of the difficulties that pharmacies were facing when obtaining prescribers' unique identification numbers, and it knowingly paid claims containing dummy prescriber identification numbers because it did not want the prescriptions of Medicare re-cipients to be rejected. *See id.* at 764. Based on that evidence, the Third Circuit held that the defendant's violation of the requirement that claims include true, unique prescriber identification numbers was not material to the United States' decision to pay the claims. *See id.* at 763–65. That analysis was, of course, based on the evi-dence available in the *Spay* record, and there is no similar evidence here.

In sum, there was sufficient evidence for the jury to have found that, had Medicare known of Pinellas' misrepresentations, it would not have paid the refiled reimbursement claims. We therefore reject Pinellas' challenge to the verdict.

## D

Pinellas submits that the evidence does not demonstrate that it acted knowingly. According to Pinellas, it was confused about the proper procedure for obtaining a CLIA certificate for Bayfront, and until it cleared up that confusion it was unaware that it could not use Park Place's CLIA certificate number for laboratory tests conducted at Bayfront. As Pinellas sees it, the 214 claims for which it was found liable should be chalked up to "honest mistakes or negligent claims," which is insufficient to satisfy the FCA's scienter element. We disagree with Pinellas' arguments on this point as well.

Liability under the FCA arises only when a defendant acted "knowingly." *See* §§ 3729(a)(1)(A) & (a)(1)(B); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015). The FCA defines the term "knowingly" to "mean that a person, with respect to information . . . . (i) has actual knowledge of the information; . . . . (ii) acts in deliberate ignorance of the truth or falsity of the information; or . . . . (iii) acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A). A defendant need not, however, have acted with the specific intent to defraud the United States. *See* § 3729(b)(1)(B).

Reckless disregard is the lowest scienter threshold under the FCA. *See Urquilla-Diaz,* 780 F.3d at 1058 n.15. As a result, so long as a reasonable jury could have found that Pinellas acted with reckless disregard of the truth or falsity of the relevant information, we must uphold the verdict.

Under the FCA, reckless disregard is tantamount to gross negligence. *See id.* at 1058. When Congress added reckless disregard to the FCA's scienter element in 1986, it intended to capture "the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *Id.* (internal quotation marks omitted). So, a person acts with reckless disregard—and thus "knowingly"—under the FCA when he "knows or has reason to know of facts that would lead a reasonable person to realize that harm is the likely result of the relevant act." *Id.* (internal quotation marks omitted).

In this case there was sufficient evidence for the jury to find that Pinellas acted with reckless disregard of the truth or falsity of the information it included in the 214 claims for which it was found liable. Take, for example, the testimony of Dr. David Dresdner, the former owner of Bayfront. He testified that after he sold his practice to Pinellas, his laboratory manager offered Dr. Desai assistance in obtaining a CLIA certificate, but Dr. Desai rejected the offer, stating that she knew the process for obtaining one. Moreover, Ms. Valentin's May 9th email shows that Pinellas was aware that Medicare was denying the claims it submitted with Park Place's

CLIA certificate number.  The solution provided in that email was to change the location of service to Park Place's address *until* the CLIA certificate issue was "fixed"—i.e., while the issue remained "unfixed"—and to refile the claims.  Ms. Valentin's July 14th email acknowledged that Pinellas had not yet obtained the proper CLIA certificate for Bayfront and likewise explained that the solution was to change the location of service to Park Place's address and refile the claims.  And Ms. Yates testified on redirect that she heard Dr. Desai and her husband say that they knew that they could not bill Medicare for laboratory tests conducted at an uncertified laboratory.

Broadly speaking, Pinellas presents two arguments on scienter.  The first is that it believed that it could transfer Bayfront's CLIA certificate to Park Place.  The second is that Dr. Desai had ordered the billing department to hold all Bayfront claims until the transfer was completed.

The first argument misses the point.  Whether Pinellas believed (mistakenly or not) that it could transfer Bayfront's pre-existing CLIA certificate does not negate the fact that before Bayfront possessed a valid CLIA certificate (irrespective of the proper method of acquisition) Pinellas filed Medicare claims for laboratory tests conducted there.  The question is whether Pinellas acted with, at least, reckless disregard of the truth or falsity of the certification of compliance that the use of Park Place's CLIA certificate number and address entailed.  The record evidence is sufficient for the jury to find that it did.

The second argument—that Dr. Desai had ordered the billing department to hold all Medicare claims for Bayfront laboratory tests—fares little better.  Though Dr. Desai testified that she issued such a hold, Ms. Yates contradicted that testimony.  We recognize that Ms. Bolton corroborated Dr. Desai's testimony, but Dr. Desai was copied on both the May 9th and July 14th emails that explained the procedure for altering the information on the rejected Bayfront reimbursement claims and refiling them, and she never objected to those directions.  In short, whether a hold was issued, and if so, what the hold said about Pinellas' knowledge, were quintessential jury issues, and "[i]t is for the jury—not for us or the district court— to weigh conflicting evidence and inferences and determine the credibility of witnesses." *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1230 (11th Cir. 2020) (internal quotation marks omitted).

Viewed in the light most favorable to the verdict, the evidence on scienter is not overwhelmingly in favor of Pinellas.  The jury's decision therefore stands.

## E

In addition to challenging the verdict on liability, Pinellas asks us to overturn the jury's finding that the United States suffered $755.54 in damages.  According to Pinellas, the measure of damages in an FCA action is the difference between the market value of the product or service that the United States received and the market value of the promised product or service.  In this case, there is no dispute that Pinellas conducted the laboratory tests for which it billed Medicare.  Therefore, Pinellas says, the United States

received the benefit that it bargained for and suffered no damages by paying the fraudulent claims.  Though superficially attractive, the argument fails.

A person who violates the FCA is liable to the United States for "3 times the amount of damages which the Government sustains because of the act of that person." § 3729(a)(1).  But "there is no set formula for determining the government's actual damages." *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988). That is because "'[f]raudulent interference with the government's activities damages the government in numerous ways that vary from case to case.'" *Id.* (quoting S. Rep. No. 96-615, at 4 (1980)).

In the context of a product or service that is provided *to* the United States, courts have indeed measured damages by comparing the market value of the delivered product or service with that of the product or service that was promised.  *See, e.g.*, *United States v. Bornstein*, 423 U.S. 303, 316 n.13 (1976); *United States ex rel. Wall v. Circle C Constr., LLC*, 868 F.3d 466, 470 (6th Cir. 2017); *Science Applications*, 626 F.3d at 1278.  But in the context of Medicare claims, where no product or service is provided *to* the United States, courts have measured damages as the difference between what the government paid and what it would have paid had the defendant's claim been truthful and accurate.  *See United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003); *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386 (4th Cir. 2015); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008).  The rationale is that, had the defendant truthfully admitted that it was non-

compliant, the United States would not have paid. *See Rogan*, 517 F.3d at 453. For a number of reasons, we believe that the proper measure of damages here is the difference between what the United States paid and what it would have paid had Pinellas' claims been truthful.

Pinellas' argument that the United States fully received what it bargained for—because the billed-for laboratory tests were conducted—suffers from a conceptual conflict with our post-*Escobar* understanding of materiality. In *Escobar*, the Supreme Court rejected the notion that a false claim is material if the United States merely *could* refuse payment if it were aware of the violation— irrespective of whether it did or would. *See Escobar*, 136 S. Ct. at 2003. Instead, the Court held that "materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *See id.* at 2002 (internal quotation marks omitted).

Given what *Escobar* held, ruling that the United States did not incur damages when it in fact paid for claims that it would not have paid had they been truthful is difficult to square with a finding that a false statement or representation is material. Indeed, Pinellas' argument ignores the implicit, necessary conclusion of the jury's materiality finding—that CLIA certification is a considerable part of what the United States expected and bargained for.

In *Killough* we rejected an argument similar to Pinellas'— that outside of the context of the delivery of a product or service to the United States, damages can be determined based on the value

purportedly provided to the United States. *Killough* involved a kickback scheme in the awarding of government contracts to build mobile homes in the aftermath of a hurricane. *See Killough*, 848 F.2d at 1525. Officials responsible for awarding contracts would solicit kickbacks and, to generate money for the kickbacks, contractors would submit inflated invoices. *See id.* We held that, though there is no set formula for calculating the United States' damages in an FCA action, the proper measure of damages there was "the difference between what the government actually paid on the fraudulent claim and what it would have paid had there been fair, open and competitive bidding." *Id.* at 1532. We rejected the defendants' argument that because the bids of the contractors who had not participated in the scheme were at least as expensive as those of the corrupt contractors, the United States had suffered no damages when contracts were awarded to the corrupt contractors. *See id.* Hence, instead of ruling that the United States had suffered $0 in damages, we affirmed the jury's finding that it had suffered $633,000 in damages. *See id.*

The similarities between this case and *Mackby*, *Drakeford*, and *Rogan* persuade us that the damages analysis in those cases fit here. Like this case, *Mackby*, *Drakeford*, and *Rogan* involved the submission of Medicare reimbursement claims and the false certification of compliance with a condition required for payment. *See Mackby*, 339 F.3d at 1014–15 (compliance with requirement that physical therapy be rendered by a physician, a qualified employee of a physician, a physician-directed clinic, or a qualified physical

therapist); *Drakeford*, 792 F.3d at 386 (compliance with the Stark Amendments to the Medicare Act); *Rogan*, 517 F.3d at 452–453 (same). Each case explained that the proper measure of damages is the difference between what the United States paid and what it would have paid had the claims been truthful and accurate. *See Mackby*, 339 F.3d at 1018–19; *Drakeford*, 792 F.3d at 386–87; *Rogan*, 517 F.3d at 453. And each case held that the difference was the full amount that the United States paid because, had the defendants truthfully admitted that they were non-compliant, the United States would not have paid.

As a result, we think that the proper measure of damages in this case is the difference between what the United States paid and what it would have paid had Pinellas' claims been truthful. The jury found that amount to be $755.54, the sum paid by the United States on Pinellas' third set of false claims. Because the jury could have found that the United States would have paid nothing had Pinellas' claims been truthful and accurate, we affirm its finding on damages.

## F

We conclude our analysis of Pinellas' challenge to the jury's verdict by addressing one final set of arguments. In addition to its more general challenges, Pinellas also contests discrete subsets of the 214 claims on which the jury based its verdict. According to Pinellas, these claim subsets are either not false, not material, or neither false nor material. The parties debated those matters in supplemental briefing on Pinellas' motion for remittitur, and the

district court ruled in favor of Ms. Yates. Reviewing for abuse of discretion, *see Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013), we affirm the district court's ruling on Pinellas' tailored challenges.

Pinellas first argues that 18 claims should be excised from the verdict because they do not contain Park Place's CLIA certificate number or its address. The factual premise of Pinellas' argument is simply not true—each of those claims includes Park Place's CLIA certificate number and some also include Park Place's address. We know because we looked. Pinellas similarly claims that four claims were not submitted to Medicare. That is also untrue—each one was indeed submitted.

In addition, Pinellas contends that 58 claims did not include charges for one type of laboratory test—a complete blood count test. In the district court, Ms. Yates responded that all but two of those claims included charges for complete blood count tests. Our review of the record convinces us that Ms. Yates was right. The remaining two claims, Ms. Yates explained, included charges for other laboratory tests that also require a CLIA certificate. On appeal, Pinellas does not explain why the district court erred in ruling for Ms. Yates on those two claims. It has therefore abandoned any argument related to them. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

Finally, Pinellas identifies 21 claims that were submitted to Medicare more than once and characterizes them as duplicates. What exactly Pinellas argues is unclear. To the extent that Pinellas

implies that imposing liability for those claims constitutes double-dipping, Ms. Yates correctly explained below that Pinellas submitted the claims to Medicare more than once, and thus that each claim constitutes a distinct request for payment. Insofar as Pinellas argues that the 21 claims are not material, we disagree for the reasons we have laid out earlier.

## IV

Having finished the heavy lift of analyzing Pinellas' challenges to the jury's verdict, we turn to its challenge of the total monetary award. To recall, the monetary award of $1,179,266.62 is comprised of $2,266.62 in treble damages and $1,177,000.00 in statutory penalties ($5,500 per violation).

Whether a particular FCA monetary award violates the Eighth Amendment's Excessive Fines Clause is a legal question subject to plenary review. See United States v. Bajakajian, 524 U.S. 321, 336 (1998). The parties dispute whether the Eighth Amendment's Excessive Fines Clause applies to the monetary award, and, if it does, whether the award constitutes an excessive fine. They also disagree about whether Ms. Yates' share of the monetary award should be decreased.

## A

There are two civil enforcement mechanisms under the FCA (other than a private right of action for retaliation). The United States can initiate a civil action, see § 3730(a), or a private plaintiff (called a relator) can initiate a civil action on behalf of the

30                     Opinion of the Court                    20-10276

United States, *see* § 3730(b)(1), in what is referred to as a qui tam suit.  There are, in turn, two classes of qui tam actions under the FCA: one in which the United States intervenes and thereby becomes the primary party responsible for prosecuting the suit, and one in which the United States chooses to not intervene.  *See* §§ 3730(b)(1) & (c)(1).  The case before us is a qui tam action filed by Ms. Yates, as the relator, in which the United States chose to not intervene.

The Eighth Amendment provides that: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const., amdt. 8.  The Supreme Court has held that "[t]he Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense."  *Austin v. United States*, 509 U.S. 602, 609–10 (1993) (internal quotation marks omitted).  So punitive damages awarded in civil disputes between private parties are not subject to the Eighth Amendment's proscription on excessive fines.  *See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 260, 268, 275 (1989).[4]

Though the United States is not a formal party in a non-intervened qui tam action, in such a case the relator prosecutes the suit "in the name of the [United States]," *see* § 3730(b)(1), as a

---

[4] Punitive damages awarded in litigation between private parties, however, must satisfy due process standards.  *See BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 568–86 (1996).

partial assignee of the United States' damages claim. *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). And in a non-intervened qui tam action, the United States generally receives between 70 and 75 percent of the recovery, with the relator receiving the rest. *See* § 3730(d)(2). Non-intervened FCA qui tam actions therefore fall in a grey area between disputes amongst purely private parties and disputes pitting the United States against a private party.

The Supreme Court has left open whether the Excessive Fines Clause applies to non-intervened FCA qui tam actions. *See Browning-Ferris*, 492 U.S. at 275 n.21; *Austin*, 509 U.S. at 607 n.3. None of our sister circuits has directly answered that question. *Cf. Hays v. Hoffman*, 325 F.3d 982, 992 (8th Cir. 2003) (stating in dicta, in a qui tam action in which the United States had not intervened at the district court, that FCA penalties are encompassed by the Excessive Fines Clause). At least one district court, however, has provided an affirmative answer. *See United States ex rel. Smith v. Gilbert Realty Co., Inc.,* 840 F. Supp. 71, 74 (E.D. Mich. 1993) (holding that the Excessive Fines Clause applies to a non-intervened qui tam action because it "is brought in the name of the United States by a private party[, and] [t]he Government will share in the proceeds"). We likewise answer the question in the affirmative, and hold that the damages and statutory penalties awarded in a non-intervened FCA qui tam action are subject to the Eighth Amendment's prohibition on excessive fines.

We first explain why an FCA monetary award is a "fine" for purposes of the Eighth Amendment. We then conclude that it is the United States that imposes such a fine in a non-intervened qui tam action.[5]

### 1

The Excessive Fines Clause applies only to "fines," i.e., "payment[s] to a sovereign as punishment for some offense." *Bajakajian*, 524 U.S. at 327 (internal quotation marks omitted). We must therefore decide whether an FCA monetary award is a fine for the purposes of the Excessive Fines Clause. We conclude that it is.

A payment constitutes a fine so long as "it can only be explained as serving in part to punish." *Austin*, 509 U.S. at 610. *See also Bajakajian*, 524 U.S. at 328. In *Stevens*, the Supreme Court explained that the FCA's treble damages and statutory penalties "are essentially punitive in nature." *Stevens*, 529 U.S. at 784–86. It noted that "[t]he very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Id.* at 786. That is even more true of the FCA's statutory penalties—which are preset by Congress and compulsory irrespective of the magnitude of the financial injury to the United States, if any. *See* § 3279(a)(1); *Killough*, 848 F.2d at

---

[5] In addition to the FCA, at least one other federal statute authorizes qui tam actions. *See* 25 U.S.C. § 201 (providing a cause of action and share of recovery against a person who violates Indian protection laws). We do not address that statute today, as it is not before us.

1533.  And though FCA treble damages have a compensatory aspect, *see Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003), FCA monetary awards are, at least, partially punitive.  In fact, the Ninth, Eighth, and Fourth Circuits have all accepted that FCA monetary awards are fines for the purposes of the Excessive Fines Clause, precisely because they are at least in part punitive.  *See United States v. Mackby*, 261 F.3d 821, 830–31 (9th Cir. 2001); *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014); *Drakeford*, 792 F.3d at 387–89.  We join those circuits today and hold that FCA monetary awards constitute fines for the purposes of the Excessive Fines Clause.

**2**

"The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense."  *Austin*, 509 U.S. at 609–10 (internal quotation marks omitted).  That is because the object of the Eighth Amendment is "to prevent *the government* from abusing its power to punish."  *Id.* at 607.  Consequently, the Excessive Fines Clause applies only to payments imposed by the United States (or the States) and payable to it (or them).  *See id.* at 606–07; *Browning-Ferris*, 492 U.S. at 264.[6]

---

[6] The Excessive Fines Clause has been incorporated, and is thus applicable to the States, through the Due Process Clause of the Fourteenth Amendment. *See Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019).

We have no difficulty concluding that the monetary award in a non-intervened FCA qui tam action meets the second prong of the Supreme Court's Eighth Amendment framework. In a non-intervened action, the United States generally receives between 70 and 75 percent of the recovery, but its share can be even greater in some circumstances. *See* §§ 3730(d)(2) & (3). The question is whether the monetary award in a non-intervened qui tam action is imposed by the United States. *See Austin*, 509 U.S. at 607. For the following reasons, we conclude that that it is.

First, all monetary awards in FCA qui tam actions are imposed by the United States because they are mandated by the FCA, a federal law enacted by Congress. Ms. Yates argues that the monetary award here was not imposed by the United States because it was not a party to the proceedings below. But that argument ignores that the Excessive Fines Clause challenge here is aimed at *the application of the FCA*, and not simply the litigation behavior of a private party. Ms. Yates is correct that the Eighth Amendment serves as a check on the power of the sovereign, but Goliath (to use her term) acted by mandating through federal law—the FCA—the imposition of treble damages and statutory penalties. *See* § 3729(a).

For all the ink spilled on the identity of the formal party in a non-intervened action, this case involves what Chief Justice Marshall called "a proposition too plain to be contested." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803). The FCA is a federal enactment, and therefore it must comply with the Constitution. *See id.* at 180 ("[A] law repugnant to the constitution is void; and [

] courts, *as well as other departments*, are bound by that instrument.") (emphasis altered from original). *See also United States v. Comstock,* 560 U.S. 126, 135 (2010) ("[A] federal statute . . . must . . . not [be] prohibited by the Constitution.") (internal quotation marks omitted). Indeed, the subjection of statutes to the Constitution is the premise that undergirds the doctrine of judicial review. *See Marbury,* 5 U.S. at 176–80. *See also Natl. Fedn. of Indep. Bus. v. Sebelius,* 567 U.S. 519, 538 (2012) (explaining that because the powers of Congress are defined and limited by the Constitution, "it is the responsibility of [the judiciary] to enforce the limits on federal power by striking down acts of Congress that transgress those limits").

As we have explained, FCA monetary awards are fines—i.e., they constitute payment to the United States as punishment (or at least in part as punishment) for an offense. *See Bajakajian,* 524 U.S. at 327. That conclusion cannot be reconciled with the theory that such fines are not imposed by the United States simply because Congress ordered their imposition irrespective of the Executive's decision whether to intervene. That imposition and the fact that the United States receives the bulk of the monetary award are the direct result of government action. *Cf. Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 941 (1982) ("[T]he procedural scheme created by the statute obviously is the product of [government] action."). Pinellas' challenge is to the FCA as applied, and accordingly it is a challenge precisely about whether the United States

overstepped its constitutional bounds.  That claim is fully within the purview of the Excessive Fines Clause.

Second, even if we accept Ms. Yates' premise that we should focus only on the government's lack of formal party status in non-intervened qui tam actions, we conclude that any resulting monetary award is imposed by, and attributable to, the United States. Unlike a traditional private party, a relator does not initiate an FCA action to recover for an injury she herself suffered.  She is instead filing suit on behalf of the United States, *see* § 3730(b)(1), for a fraud committed against the United States, *see* § 3730(a), and as a partial assignee of the United States' damages claim. *See Stevens*, 529 U.S. at 773.  Indeed, "[a] qui tam relator has suffered no [ ] invasion [of a legally protected right]," and it is "the United States' injury [that] suffices to confer standing on [the relator]." *Id.* at 773, 774.  In short, "the private plaintiff is merely acting as a stand-in for the government." *Makro Capital of America, Inc. v. UBS AG*, 543 F.3d 1254, 1260 (11th Cir. 2008).  Though the United States is not a formal party to a non-intervened qui tam action, it remains a real party in interest. *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934–36 (2009).  Consequently, "the fact that the government delegates some portion of [its] power to private litigants does not change the governmental character of the power exercised." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 626 (1991).

To the extent that an FCA relator must be considered a government actor of some kind to trigger the Eighth Amendment,

such a requirement is satisfied here. Courts consider private persons to be government actors when they perform "a function which is traditionally the exclusive prerogative of the state." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) (finding state action in the provision of medical services in a prison by a private provider). *See Harper v. Prof. Probation Servs. Inc.*, 976 F.3d 1236, 1240 n.5 (11th Cir. 2020) (finding state action where a private party was delegated the judicial function of the state).

Here, the traditional, exclusive function of the government is the protection of the public fisc. *See United States v. Hughes Properties, Inc.*, 476 U.S. 593, 603 (1986) ("[T]he major responsibility of the Internal Revenue Service is to protect the public fisc."); *Wilkins v. Gaddy*, 734 F.3d 344, 351 (4th Cir. 2013) ("Protection of the public fisc is a core responsibility of the legislative branch."). The FCA's qui tam provisions merely grant the United States the flexibility to do so effectively through an avatar in litigation. *See United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 406 (4th Cir. 2013) ("[T]he FCA was crafted in acknowledgment of the flexibility typically afforded the government to right a public wrong."); *United States v. Northrop Corp.*, 59 F.3d 953, 968 (9th Cir. 1995) ("The relator's right to recovery exists solely as a mechanism for deterring fraud and returning funds to the federal treasury.") (emphasis omitted). That a private litigant acts as a "collection agent for the government" does not negate the fact that the United States imposes the monetary award for the harm to the public fisc. *See* Nancy J. King, *Portioning Punishment:*

*Constitutional Limits on Successive and Excessive Penalties*, 144 U. Pa. L. Rev. 101, 180 (1995).

Furthermore, the United States exercises sufficient control in non-intervened qui tam actions that it imposes any resulting monetary award. At the beginning of a non-intervened qui tam action, the United States possesses significant procedural rights that allow it to decide whether to intervene. A relator who files a qui tam complaint under the FCA must do so under seal and serve it only on the United States. *See* § 3730(b)(2). While the lawsuit remains under seal, the United States may serve a civil investigative demand upon any person believed to be in possession of documents or information relevant to an investigation of false claims, which would require that person to produce documents, answer interrogatories, or give oral testimony. *See* § 3733(a)(1). And "the United States may meet with the relator and her attorney, giving the government an opportunity to ask questions to assess the strengths and weaknesses of the case and the relator a chance to assist the government's investigation." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1086 (11th Cir. 2018). Finally, in non-intervened qui tam actions, the relator has primary responsibility to assert the rights of the United States only because the latter allows it to do so by declining to intervene. *See* §§ 3730(b)(2) & (b)(3).

And "even in cases where the government does not intervene, there are a number of control mechanisms present in the qui tam provisions of the FCA so that the Executive nonetheless retains

a significant amount of control over the litigation." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc) (rejecting an Article II challenge to the FCA's qui tam provisions). The United States retains the right to request to intervene at any time, a request that may be granted for good cause. *See* § 3730(c)(3). It can also request to be served with copies of all pleadings and supplied copies of all deposition transcripts. *See id.* The United States can obtain a stay of discovery if it "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts." § 3730(c)(4). Significantly, the relator cannot dismiss her qui tam action unless the United States consents in writing. *See* § 3730(b)(1).

We have already recognized and relied on the substantial control that the United States possesses over non-intervened FCA qui tam actions in other contexts. In *Hunt*, for example, we held that a subsection of the FCA's statute of limitations provision applies in non-intervened qui tam cases. *See Hunt*, 887 F.3d at 1092. That provision, § 3731(b)(2), limits the time to file suit to "3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." The appellees in *Hunt* argued that § 3731(b)(2) did not apply in non-intervened actions because it would be absurd to have a knowledge-based limitations period depend on a non-party's knowledge. *See id.* at 1091. We rejected the opinions of courts that had agreed with the appellees' theory, explaining that "[t]hey reflexively applied the

general rule that a limitations period is triggered by the knowledge of a party [while] fail[ing] to consider the unique role that the United States plays even in a non-intervened qui tam case." *Id.* at 1092. Instead, we concluded that § 3731(b)(2) applies to non-intervened qui tam suits because "the United States remains the real party in interest and retains significant control over the case." *Id.* at 1091.

The United States maintains this control at the remedy phase of qui tam proceedings. "Any recovery obtained from a defendant in an FCA qui tam action belongs to the United States." *Id.* at 1087. Thus, as noted above, the United States receives the lion's share of the monetary award in a non-intervened qui tam action. *See* § 3730(d)(2). The relator, in contrast, receives a small share of the award as a bounty for prosecuting the action on the United States' behalf. *See Stevens*, 529 U.S. at 772. In certain instances, the FCA even augments the portion of the monetary award that the United States receives. *See* § 3730(d)(3).

Such is the United States' grip that, subject to court approval, even in a non-intervened action it "may settle the action with the defendant notwithstanding the objections of the person initiating the action [i.e., the relator]." § 3730(c)(2)(B). Our decision in *United States v. Everglades College, Inc.*, 855 F.3d 1279 (11th Cir. 2017), is instructive in this regard. In *Everglades College*, the relators had been successful in a non-intervened action. *See id.* at 1282. Believing that they deserved a larger monetary award, the relators appealed. *See id.* at 1284. During the pendency of the

appeal, the United States settled with one of the defendants, securing a larger sum than the one the relators had obtained. *See id.* at 1284–85. But the relators thought that they could obtain an even larger sum, so they also appealed the district court's approval of the settlement. *See id.* at 1285, 1289. We upheld the United States' settlement. *See id.* at 1289. We held that when the United States steps in to settle a non-intervened FCA qui tam action after trial, it need not show good cause. *See id.* at 1285. We also noted that its decision to settle could be based on considerations different from a relator's, such as public policy, political ramifications, efficient use of its limited prosecutorial resources, or wariness of the impact of potential adverse appellate decisions. *See id.* at 1288–89. After all, "when the government settles a qui tam case, it is agreeing to compromise with respect to its own injuries only, not those of the relator." *Id.* at 1288. And we held that courts should grant deference to the settlement rationale of the United States because "[its] decision to end a case through settlement is similar enough to a decision to dismiss the case—a choice committed to the discretion of the Executive Branch." *Id.*

Precisely because of the United States' significant control over FCA qui tam actions, our sister circuits have held that they do not violate (i) Article II's Take Care Clause, *see Riley*, 252 F.3d at 753–57; (ii) the principle of separation of powers, *see United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749–57 (9th Cir. 1993); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kreindler &*

*Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154–56 (2d Cir. 1993); or (iii) the States' Eleventh Amendment immunity, *see United States. ex rel. Milam v. U. of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 48–49 (4th Cir. 1992).[7]

Those constitutional issues are not before us, so we take no position on our sister circuits' ultimate conclusions. We think those cases are nevertheless relevant due to their reliance on the United States' substantial control over FCA qui tam actions. *See Riley*, 252 F.3d at 753 ("[T]hough Congress has historically allowed alternative mechanisms of fraud enforcement against the federal government, this state of affairs does not therefore mean that the Executive's functions to control such litigation are necessarily impinged . . . . [T]he Executive retains significant control over litigation pursued under the FCA by a qui tam relator."); *Kreindler*, 985 F.2d at 1155 ("[T]he FCA qui tam provisions do not usurp the executive branch's litigating function because the statute gives the executive branch substantial control over the litigation."); *Kelly*, 9 F.3d at 757 (holding that the FCA's qui tam provisions do not "disrupt the proper balance between the branches because . . . the FCA permits the Executive Branch to retain sufficient control over prosecutorial functions") (internal quotation marks omitted);

---

[7] In *Stevens*, the Supreme Court held that States are not subject to liability under the FCA because they are not "persons" for the purposes of the FCA. *See Stevens*, 529 U.S. at 787. It left open, however, whether the Eleventh Amendment provides immunity to States from non-intervened qui tam actions. *See id.* at 773 n.4.

*Taxpayers Against Fraud*, 41 F.3d at 1041 (explaining that the FCA's qui tam provisions "have been crafted with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims") (internal quotation marks omitted); *Milam*, 961 F.2d at 48–49 (ruling that a non-intervened qui tam action "is [ ] a suit by the United States" in part because of "the extensive power the government has to control the litigation").

The FCA itself, our interpretation of its provisions, and the decisions of our sister circuits all point to the United States' considerable authority over intervened and non-intervened qui tam actions. Given that power, the United States still imposes an FCA monetary award for the purposes of the Eighth Amendment, even when it lacks formal party status.

Third, and to conclude, the history and nature of qui tam actions support our understanding that the United States imposes the monetary award in a non-intervened FCA action. Statutory qui tam actions trace back to 14th-century England, when Parliament authorized two types: those that allowed injured parties to sue to vindicate their own interests and those of the Crown, and "those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves." *Stevens*, 529 U.S. at 775. *See also* 3 William Blackstone, Commentaries *160 (1768). FCA qui tam actions are of the latter type. *See Stevens*, 529 U.S. at 773 (explaining that "[a] qui tam relator has suffered no . . . invasion [of a legally protected] right").

The impetus for the authorization of qui tam actions was the truism that governments have limited resources. *See* J. Randy Beck, *The False Claims Act and the English Eradication of Qui Tam Legislation*, 78 N.C. L. Rev. 539, 568 (2000) ("The King, of course, could not be in all places at all times. Nor did he have an extensive network of paid royal officials whose loyalty to the interests of the Crown could be assumed. . . . Parliament's solution was to permit qui tam enforcement of the penalty [for statutory violations]."). Providing a share of the recovery to those who initiated qui tam actions incentivized persons with knowledge of violations to come forward (hence the name, "informer"). *See id.* In that way, "the default method of enforcement was to induce the cooperation of local citizens to act as the King's agents." *Id.*

Statutes authorizing qui tam actions were common in the early Republic. *See Stevens*, 529 U.S. at 776. The First, Second, Third, and Fourth Congresses promulgated numerous statutes authorizing qui tam actions. *See id.* at 776–77 nn.5–7 (listing statutes passed by the First Congress authorizing qui tam actions); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1125 (11th Cir. 2021) (Newsom, J., concurring) (identifying statutes passed by the First, Second, Third, and Fourth Congresses authorizing qui tam actions). Chief Justice Marshall noted in *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805), that "[a]lmost every fine or forfeiture under a penal statute, may be recovered by an action of debt, as well as by information." In other words, qui tam actions were viewed as a routine enforcement mechanism in the early Republic. It thus

stands to reason that the Eighth Amendment's prohibition on excessive fines would have been considerably circumscribed if it exempted such actions.

FCA qui tam actions serve the same enforcement purpose. The Senate Judiciary Committee's report on the 1986 amendments to the FCA explained that "perhaps the most serious problem plaguing effective enforcement [of the FCA] is a lack of resources on the part of Federal enforcement agencies." S. Rep. 99-345, at 7. That meant that the United States was forced to screen potential cases based on financial considerations and was outmanned by corporate defendants. *See id.* The treble damages and increased statutory penalties "allow and encourage assistance from the private citizenry [who] can make a significant impact on bolstering the Government's fraud enforcement effort." *Id.* at 8. That history "makes clear that the qui tam provisions were intended to expand the government's ability to prosecute wrongdoing directed at the government by rewarding informers; they were not primarily for the benefit of the informer." Michael Waldman, *"Damage Control": A Defendant's Approach to the Damage and Penalty Provisions of the Civil False Claims Act*, 21 Pub. Contract L.J. 131, 154 (1992).

All of this leads us to conclude that the United States' lack of formal party status in a non-intervened qui tam action is not dispositive. The United States is still imposing and receiving a penalty for an offense committed against it. Given that reality, we will not exalt form over substance. Accordingly, a monetary award in a

non-intervened qui tam action is imposed by the United States. *See Austin*, 509 U.S. at 607.[8]

## B

A fine "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. We hold that the monetary award (i.e., the "fine") imposed in this case does not violate the Excessive Fines Clause.

Before delving in, we address the parties' debate on whether we should consider the amount of the fine cumulatively or per-violation. Our answer is that in this case it does not matter. Seeing a judgment of $1.179 million based on $755.54 in actual damages may raise an eyebrow. But whatever optics inure to Pinellas' benefit by that comparison, they are negated when one realizes that this total is the result of Pinellas' repeated (214) instances of fraud against the United States. The district court here imposed the lowest-possible statutory penalty of $5,500 for all of the 214 violations, and treble damages are mandated by the FCA. Therefore, no matter the perspective, the monetary award imposed represents the lowest possible sanction under the FCA.

"Translating the gravity of a crime [or offense] into monetary terms—such that it can be proportioned to the value of [a

---

[8] The United States, as amicus curiae, agreed at oral argument that the Excessive Fines Clause applies in this case. *See* Oral Arg. Tr. at 23:43–50. We are not bound by its constitutional position, *see Orloff v. Willoughby*, 345 U.S. 83, 87 (1953), but based on our independent analysis we agree.

20-10276               Opinion of the Court                    47

fine]—is not a simple task." *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999). But we have identified several, non-exhaustive factors that guide an Excessive Fines Clause analysis: (i) whether the defendant is in the class of persons at whom the statute was principally directed; (ii) how the imposed penalties compare to other penalties authorized by the legislature; and (iii) the harm caused by the defendant. *See United States v. Chaplin's, Inc.*, 646 F.3d 846, 851 (11th Cir. 2011). *See also Bajakajian*, 524 U.S. at 338–39 (considering, among other things, the three factors we identified in *Chaplin*); *Mackby*, 339 F.3d at 1017–18 (same).

Additionally, we have recognized that "Congress, as a representative body, can distill the monetary value society places on harmful conduct," and thus that "[penalties] falling below the maximum statutory fines for a given offense . . . receive a strong presumption of constitutionality." *Chaplin's*, 646 F.3d at 852 (internal quotation marks omitted). *See Bajakajian*, 524 U.S. at 336 ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."). Because the monetary award here is at the statutory minimum, we grant it a strong presumption of constitutionality and proceed to determine whether Pinellas has rebutted that presumption. We do not think it has.

For starters, Pinellas is in the class of defendants at whom the FCA is principally directed. The FCA imposes liability on any person who defrauds or conspires to defraud the United States. *See* § 3729(a)(1). It is the United States' "primary litigative tool for combatting fraud" against it and "is intended to reach all fraudulent

attempts to cause the Government to pay our [sic] sums of money." S. Rep. No. 99-345, at 2, 9. Pinellas is not in the same position as the defendant in *Bajakajian*, who, by not reporting the removal of legal currency from the United States, was subject to forfeiture under a statute principally targeted at money launderers, drug traffickers, or tax evaders. *See Bajakajian*, 524 U.S. at 338. Pinellas, by submitting fraudulent claims, is squarely in the FCA's crosshairs. *See Mackby*, 339 F.3d at 1017 (finding that the defendant, who submitted false reimbursement claims to Medicare, fell among the class of persons targeted by the FCA).

Pinellas contends that it merely made an "error" in submitting its claims with Park Place's CLIA certificate number and address, and that this error is not the type of violation at which the FCA is directed. That, however, is merely an attempt to refashion an evidentiary liability challenge into an Excessive Fines Clause argument. To the extent that Pinellas' assertion is that any violations were inadvertent, we have already upheld the jury's finding as to scienter. *See Drakeford*, 792 F.3d at 389 (rejecting an argument that, as the defendant's FCA violations were the result of a "mere accident," damages should be reduced, because the jury had already found that the defendant had acted knowingly). And if Pinellas is trying to diminish the gravity of its violation, our ruling on materiality forecloses that gambit as well. *See Escobar*, 136 S. Ct. at 2003 ("Materiality . . . cannot be found where noncompliance is minor or insubstantial.").

The treble damages awarded here also compare favorably to other penalties authorized by Congress. Treble damages are authorized by Congress in other statutes. *See*, *e.g.*, 18 U.S.C. § 1964(c) (authorizing treble damages in a civil RICO suit); 15 U.S.C. § 15(a) (same for violations of the Clayton Act); 35 U.S.C. § 284 (same for patent infringement). Perhaps because of that, and because of the negligible value of the treble damages in this case, Pinellas does not seriously dispute their constitutionality. In any event, we conclude that the treble damages imposed by the district court do not compare unfavorably to other penalties authorized by Congress.

As to the imposed statutory penalties, they are lower than the potential maximum penalties under the FCA and other statutes. At the time of Pinellas' violations, the FCA required the imposition of statutory penalties between $5,500 and $11,000 per violation. *See* § 3729(a)(1); 28 C.F.R. § 85.3(a)(9). The penalties that the district court imposed here, based on the lowest possible statutory assessment of $5,500, were half the potential maximum. *See United States v. Emerson*, 107 F.3d 77, 80–81 (1st Cir. 1997) (holding that a $5,000 per-flight fine on a pilot for not possessing a proper FAA certificate was not excessive, in part because the statutory maximum penalty was $10,000 per flight). Moreover, in 2015 Congress passed the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, which required federal agencies to adjust civil payments to account for inflation. *See* Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701, 129 Stat. 584, 599 (2015) (codified

at 28 U.S.C. § 2461 note).  As a result of that directive, the FCA's statutory penalties currently stand at between $11,665 and $23,331 per violation.  *See* 28 C.F.R. § 85.5.  Thus, the statutory penalties imposed on Pinellas are less than half the FCA's lowest, current statutory assessment.  And they also compare well to other statutory penalties authorized by Congress.  For example, violations of the Anti-Kickback Act are subject to a $23,331 statutory penalty per violation.  *See* 41 U.S.C. § 8706(a)(1)(B); 28 C.F.R. § 85.5.  These comparisons are not determinative, but they are relevant.

The harm caused by Pinellas, moreover, is considerable.  On this point, Pinellas tries to equate harm to the $755.54 in damages that the United States suffered.  But the harm caused by an FCA violation is not so narrow.  Indeed, if Pinellas were correct, then the FCA would not require the imposition of statutory penalties even when the United States does not pay a false claim.  *See Killough*, 848 F.2d at 1533.  *See also Bunk,* 741 F.3d at 409 (imposing a penalty of $24 million even though the relator did not seek any damages).  Nor would the FCA impose statutory penalties on mere conspiracy to submit a false claim.  *See* § 3729(a)(1)(C).

Fraud harms the United States in ways untethered to the value of any ultimate payment.  For instance, we have explained that when the United States is defrauded, "the government has been damaged to the extent that such corruption causes a diminution of the public's confidence in the government." *Killough*, 848 F.2d at 1532.  Our sister circuits have reached similar conclusions. *See*, *e.g.*, *Mackby*, 339 F.3d at 1019 ("Fraudulent claims make the

administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system."); *Bunk*, 741 F.3d at 409 (noting that the prevalence of fraud "shakes the public's faith in the government's competence and may encourage others similarly situated to act in a like fashion"). Fraud imposes costs on the United States in the form of "the expense of the constant Treasury vigil [it] necessitate[s]." *Id.* at 409 (internal quotation marks omitted). *See also* Lani Anne Remick, *Penalty Points, Part Three: Constitutional Defenses*, 41 False Cl. Act and Qui Tam Q. Rev. 118, 131–32 (2006).

In the context of the FCA, we also consider the deterrent effect of a monetary award. *See Mackby*, 339 F.3d at 1019; *Bunk*, 741 F.3d at 409. In this case, the imposition of the lowest-possible monetary award—though, as the district court noted, "very harsh"—properly balances the need to deter potential fraudsters with the gravity of Pinellas' conduct. This is all the more so when one considers that the size of the award is a direct reflection of Pinellas' repeated and knowing submission of false claims to the United States. We agree with the Fourth Circuit that "[s]ubstantial penalties . . . serve as a powerful mechanism to dissuade" repeated violations of the FCA. *See Drakeford*, 792 F.3d at 389.

On this record, the monetary award imposed does not violate the Excessive Fines Clause. We reject Pinellas' contrary argument.[9]

## C

Finally, Pinellas asks us to decrease Ms. Yates' share of the monetary award. Ms. Yates, who received 30 percent of the award pursuant to an agreement with the United States, argues that Pinellas does not have standing to challenge her share because it was allocated between her and the United States. Pinellas responds that it has standing because—unlike in *Taxpayers Against Fraud*, 41 F.3d at 1046, on which Ms. Yates relies—here it is not seeking to participate in collateral litigation between the United States and a relator.

In the district court, Pinellas sought a reduction of Ms. Yates' share of the monetary award because she had supposedly planned and initiated the fraudulent scheme. *See* § 3730(d)(3) ("[I]f the court finds that the action was brought by a person who planned

---

[9] In his separate opinion, Judge Tjoflat asserts that the FCA fails to provide standards to guide a district court in choosing the appropriate penalty within the statutory range. We do not address that issue for two reasons. First, Pinellas has not based its Eighth Amendment challenge on the procedural claim that the FCA lacks standards. Second, where—as here—the statutory minimum penalty is imposed, the district court lacks the authority to go below that minimum absent a constitutional violation. In other words, standards do not come into play if the court is imposing only the statutory minimum penalty mandated by Congress.

and initiated the violation . . . , then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive."). As best we can tell, Ms. Yates did not challenge Pinellas' standing, and the district court did not rule on Pinellas' request. Given the procedural context, rather than analyze whether the district court lacked jurisdiction to consider Pinellas' argument, we hold that we lack jurisdiction to rule on Pinellas' appeal of the allocation. *See Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1250 (11th Cir. 2008) ("[A]lthough neither party challenges our jurisdiction, we are obligated to address jurisdictional questions *sua sponte*.").

The Constitution grants federal courts the power to decide issues only in the presence of an actual controversy. *See Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016); *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). Consequently, a party invoking a federal court's jurisdiction must establish that it has standing. *See Wittman*, 136 S. Ct. at 1736. That requires the party to prove that it has suffered an injury in fact, that the injury is fairly traceable to the challenged conduct, and that the injury will likely be redressed by a favorable ruling. *See id.* Because an actual controversy must persist during all stages of a litigation, "standing must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Hollingsworth*, 570 U.S. at 705 (internal quotation marks omitted). Accordingly, as in the district court, on appeal "a litigant must seek relief for an injury that affects him in a personal and individual way." *Id.* (internal

quotation marks omitted).  Moreover, because "standing is not dispensed in gross," a litigant "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

The amount of the total judgment that Pinellas must pay is independent of its allocation between Ms. Yates and the United States. Pinellas does not argue otherwise.  In fact, it admits that a reduction in Ms. Yates' share would not reduce the total judgment amount.  As a result, Pinellas has not suffered an injury in fact, let alone one that is fairly traceable to the allocation, and no injury (assuming one existed) would be redressed by a ruling from us altering the allocation.  Pinellas therefore lacks standing to appeal the allocation of the monetary award between Ms. Yates and the United States, and we have no jurisdiction to rule on it.  *See Wittman*, 136 S. Ct. at 1736–37 (dismissing an appeal by intervenors who could not explain how their alleged injury would be redressed by a favorable judicial decision).

## V

We affirm the district court's admission of Exhibit 24, the jury's verdict, and the total monetary award.  We dismiss Pinellas' appeal as to the allocation of the monetary award between Ms. Yates and the United States.

AFFIRMED IN PART AND DISMISSED IN PART

20-10276            NEWSOM, J., Concurring            1

NEWSOM, Circuit Judge, joined by JORDAN, Circuit Judge, concurring:

I concur in the Court's opinion and write separately simply to flag an issue that struck me as a little odd while working my way through this case:  In determining whether a fine set by Congress is unconstitutionally "excessive" within the meaning of the Eighth Amendment, we give great deference to Congress's judgment about the excessiveness of the fine.  *See United States v. Chaplin's, Inc.*, 646 F.3d 846, 852 (11th Cir. 2011).  As a result, Congress both levies the fine and, at least as a presumptive matter, determines its constitutionality.  Seems a bit like letting the driver set the speed limit.

And it looks to me like our hyper-deferential posture toward Congress's judgments about excessiveness stems from some lingering uncertainty about the basis for our own.  In particular, from the premise that the text and history of the Excessive Fines Clause don't shed much useful light on the excessiveness issue, we've reasoned to the conclusion that the issue should be left to Congress.  The logic is sound enough—I agree that inherently subjective judgments are often better made elsewhere—but I'm not sure the premise is correct.  Based on my own examination, the Excessive Fines Clause, as originally understood, directs our attention to two discernible and instructive guideposts: (1) the proportionality between a fine and an offense, a factor that we have traditionally considered, *and* (2) the relationship between a fine and an offender's ability to pay it, one that we have not.  Recovering that second part

of the excessiveness inquiry would make our own evaluations of fines more objective and, by extension, alleviate any felt need to be so deferential to Congress's.

Let me unpack that a bit.

## I

## A

First, a word about the deference that we give Congress in the excessive-fines space. We've held that fines "falling below the maximum statutory fines for a given offense . . . receive a 'strong presumption' of constitutionality." *Chaplin's*, 646 F.3d at 852 (quotation marks omitted); *see also United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999) ("[I]f the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional.").[1] In effect, then, Congress supplies an answer to the questions of what a fine should be *and* whether it's excessive. You might think

---

[1] Some of the caselaw on this subject involves forfeitures, but the Supreme Court has held that a forfeiture can constitute "a 'fine' within the meaning of the Excessive Fines Clause." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998); *see also Austin v. United States*, 509 U.S. 602, 614 n.7 (1993) (collecting definitions from founding-era dictionaries showing that "'fine' was understood to include 'forfeiture' and vice versa"); *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989) (explaining "that at the time of the drafting and ratification of the [Eighth]Amendment, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense").

that dynamic is strange for much the same reason that it would be odd for us to presume that a police officer's use of force wasn't excessive simply because he said so.

After all, we didn't end up with the Bill of Rights because of the founding generation's great faith in the powers that be. Brutus, for one, warned that "[t]hose who have governed have been found in all ages ever active to enlarge their powers and abridge the public liberty." Brutus II (Nov. 1, 1787), in 2 The Complete Anti-Federalist 374 (Herbert J. Storing ed., 1981). For that reason, he argued, the prohibitions against excessive bail, excessive fines, and cruel and unusual punishments were "as necessary under the general government as under that of the individual states." Id. at 375. Patrick Henry made much the same point, telling Virginia's ratifying convention that "when we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives." See Timbs v. Indiana, 139 S. Ct. 682, 696 (2019) (Thomas, J., concurring in the judgment) (quoting 3 Debates on the Federal Constitution 447 (J. Elliot, 2d ed. 1854)). Those critics counted. "The concerns voiced by the Antifederalists led to the adoption of the Bill of Rights." Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 584 (1983). So far as the Eighth Amendment was designed to limit the power of Congress to punish, then, great deference to Congress's judgments about the

4                    Newsom, J., Concurring                    20-10276

constitutionality of the punishments it chooses might be precisely the opposite of what the Eighth Amendment prescribes.[2]

Having said that, we've laid out some good reasons for respecting Congress's judgment on these questions. We've recognized, for instance, that "[t]ranslating the gravity of a crime into monetary terms . . . is not a simple task." *817 N.E. 29th Drive*, 175 F.3d at 1309. More generally, fitting a punishment to an offense entails some tough judgment calls, the nature of which might lead one to conclude that other branches are better suited to make them: "The question of what acts are 'deserving' of what punishments is bound so tightly with questions of morality and social conditions as to make it, almost by definition, a question for legislative

---

[2] As an aside, I wonder whether fines might differ from other punishments, such that the degree of deference we give congressional judgments concerning them ought to differ, too:

> There is good reason to be concerned that fines, uniquely of all punishments, will be imposed in a measure out of accord with the penal goals of retribution and deterrence. Imprisonment, corporal punishment, and even capital punishment cost a State money; fines are a source of revenue. As we have recognized in the context of other constitutional provisions, it makes sense to scrutinize governmental action more closely when the State stands to benefit.

*Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991) (opinion of Scalia, J.). I see no reason why that concern should be unique to fines imposed by states. Every government needs revenue, of course.

20-10276                NEWSOM, J., Concurring                5

resolution." *Graham v. Florida*, 560 U.S. 48, 120 (2010) (Thomas, J., dissenting).

Furthermore, since the "Eighth Amendment does not mandate adoption of any one penological theory," *Graham*, 560 U.S. at 71 (majority op.) (quotation marks omitted), Congress is generally free to select punishments with an eye to retribution, deterrence, or rehabilitation, *etc.*, or various combinations thereof. And Congress's freedom is our constraint—the Eighth Amendment gives us no power to displace Congress's choices simply because we'd have made different ones. *Cf. Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality op.) ("[T]hese Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices."). Plus, because Congress represents the American people, "its pronouncements regarding the appropriate range of fines for a crime represent the collective opinion of the American people as to what is and is not excessive." *817 N.E. 29th Drive*, 175 F.3d at 1309. To the extent that "excessiveness is a highly subjective judgment," *id.*, you can see why courts have largely left that judgment to the people's representatives.

Here's the thing: I'm not sure that excessiveness is *necessarily* a "highly subjective judgment." Because we seem to have reached that conclusion based on the Supreme Court's decision in *United States v. Bajakajian*, 524 U.S. 321 (1998), I'll turn to it now.

## B

Before *Bajakajian*, the Excessive Fines Clause had long remained largely unexplored and unexplained. That is, for about two centuries, the Supreme Court had little occasion to apply the Clause. *See Bajakajian*, 524 U.S. at 327. So it fell to the *Bajakajian* Court to flesh out a standard for determining the excessiveness of fines.

The Court began its work by examining the text and history of the Excessive Fines Clause. *Id.* at 335. Digging into those sources, the *Bajakajian* Court concluded that both showed "the centrality of proportionality to the excessiveness inquiry." *Id.* In reaching that conclusion, the Court traced the Clause's lineage to the Magna Carta, which required that economic punishments "be proportioned to the offense." *Id.* Crucially for my purposes—for reasons I'll get into—the Court also noted that the Magna Carta mandated that punishments "not deprive a wrongdoer of his livelihood." *Id.* Yet the Court passed over that second consideration, seemingly because Bajakajian hadn't argued "that his wealth or income are relevant to the proportionality determination or that full forfeiture would deprive him of his livelihood, and the District Court made no factual findings in this respect." *Id.* at 340 n.15 (citation omitted).

As to the question of proportionality, the Court observed that the "text and history of the Excessive Fines Clause . . . provide little guidance as to how disproportional a [fine] must be to the gravity of an offense in order to be 'excessive.'" *Id.* at 335. So,

20-10276                NEWSOM, J., Concurring                    7

having bracketed what I'll call the deprivation-of-livelihood issue, the Court looked to its Cruel and Unusual Punishments Clause caselaw for help with proportionality.  There, it found the principle that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336.  Extending that principle to the context of economic penalties, the Court adopted the same "gross disproportionality" standard for fines that it had used for other punishments. *See id.*  Thus, if a fine "is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." *Id.* at 337.

Significantly for our jurisprudence in this area, our Court has taken *Bajakajian* to mean that "excessiveness is determined in relation to the characteristics of the offense, *not in relation to the characteristics of the offender.*" *817 N.E. 29th Drive*, 175 F.3d at 1311 (emphasis added) (citing *Bajakajian*, 524 U.S. at 334).  It's from that premise—and perhaps because the Supreme Court had told us that text and history of the Excessive Fines Clause have little to say on the question of proportionality—that we concluded "that excessiveness is a highly subjective judgment." *Id.* at 1309.  And, again, presumably because such judgments are best left with those who represent the people, we then adopted a "strong presumption" of constitutionality for fines falling within the ranges set by Congress. *Id.*

If, as it seems, an assumption underlying our decision in *817 N.E. 29th Drive* was that *Bajakajian* positively foreclosed the possibility of considering an offender's characteristics in evaluating the

8                    NEWSOM, J., Concurring                    20-10276

excessiveness of a fine, we may have gotten that much wrong.  To be sure, the *Bajakajian* Court did say that "the test for the excessiveness of a punitive forfeiture involves *solely* a proportionality determination," 524 U.S. at 333–34 (emphasis added), and it framed that inquiry in terms of "how disproportional to the gravity of an offense a fine must be," *id.* at 336.  Yet in *Timbs v. Indiana*, the Supreme Court characterized *Bajakajian* as having "tak[en] no position on the question whether a person's income and wealth are relevant considerations in judging the excessiveness of a fine."  139 S. Ct. at 688 (majority op.).  And even before *Timbs*, other circuits had disagreed with our elision of the deprivation-of-livelihood issue from the excessiveness inquiry.  *See, e.g.*, *United States v. Levesque*, 546 F.3d 78, 83 & n.4 (1st Cir. 2008) (holding that courts should consider whether a fine "would deprive the defendant of his or her livelihood"); *United States v. Lippert*, 148 F.3d 974, 978 (8th Cir. 1998) (holding that a "defendant's ability to pay is a factor under the Excessive Fines Clause"); *United States v. Viloski*, 814 F.3d 104, 111 (2d Cir. 2016) (similar).[3]  It may be, then, that our excessive-fines jurisprudence rests in part on a misreading of *Bajakajian*.

---

[3] How exactly the deprivation-of-livelihood issue should be analyzed is the subject of some disagreement.  For instance, the First Circuit considers the deprivation-of-livelihood issue to be independent of the question of gross disproportionality, *see Levesque*, 546 F.3d at 84–85, whereas the Second Circuit considers the former as part of its test for the latter, *see Viloski*, 814 F.3d at 111–12 & n.12.  The Second Circuit's approach seems easier to reconcile with *Bajakajian*'s statement that the test for excessiveness "involves *solely* a proportionality determination," 524 U.S. at 334 (emphasis added), but the First

20-10276            Newsom, J., Concurring            9

More importantly to me, blinding ourselves to the effect of a fine on a defendant's livelihood may well contravene the original meaning of the Eighth Amendment's Excessive Fines Clause. So let's get into that.

## C

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Not exactly self-explanatory. Looking solely at the text of the Excessive Fines Clause, one is left to wonder, excessive in relation to *what*?[4] The answer, history suggests, is not just a *what*—the offense—but also a *whom*—the offender.

Return to the Eighth Amendment's lineage. It descends most directly from the Virginia Declaration of Rights, *see Solem v. Helm*, 463 U.S. 277, 286 n.10 (1983), which provided that "excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," Va. Declaration of

---

Circuit's approach may more accurately reflect the historical sources, which appear to treat the proportionality and deprivation-of-livelihood issues separately, *see id.* at 335 (explaining that the Magna Carta required that economic sanctions "be proportioned to the offense *and* that they should not deprive a wrongdoer of his livelihood" (emphasis added)).

[4] The Framers' debate on the Eighth Amendment, though quite brief, suggests that at least one participant—Samuel Livermore—had basically that question and seemed worried about who would answer it: "What is understood by excessive fines? It lies with the court to determine." 1 Annals of Congress 782 (1789) (Joseph Gales ed., 1834).

Rights § 9 (1776). That language, in turn, came from the English Bill of Rights of 1689. *See Timbs*, 139 S. Ct. at 688. And that document's prohibition on excessive fines drew on and reaffirmed the Magna Carta's guarantees. *Id.*

Among those guarantees was a prohibition on economic sanctions that would deprive an offender of his livelihood. Where the Magna Carta addressed amercements—a forerunner of fines— it required, among other things, "that the amount of the amercement be proportioned to the wrong" and "not be so large as to deprive [an offender] of his livelihood." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 271 (1989). Translated from the Latin, the most pertinent provision of the Magna Carta said the following:

> A free man shall be amerced for a small fault only according to the measure thereof, and for a great crime according to its magnitude, saving his position; and in like manner, a merchant saving his trade, and a villein saving his tillage, if they should fall under Our mercy.

*Timbs*, 139 S. Ct. at 693 (Thomas, J., concurring in the judgment) (quoting Magna Carta, Ch. 20 (1215), *in* A. Howard, *Magna Carta: Text & Commentary* 42 (rev. ed. 1998)).

To save a free man's "position," a merchant's "trade," and a villein's "tillage"—all reflect the principle that no offender be "pushed absolutely to the wall: his means of livelihood must be saved to him." William Sharp McKechnie, *Magna Carta: A*

*Commentary on the Great Charter of King John* 287 (2d ed. 1914).[5]
The Magna Carta also provided a means to that end.  No amerce-
ments could be imposed "except by the oath of honest men of the
neighbourhood."  Magna Carta, Ch. 20 (1215), *in* McKechnie, *su-
pra*, at 284.  In practice, then, after a judge ensured that sanctions
were "proportionate to the gravity of the offense," 12 members of
the offender's community could reduce the sanctions "in accord-
ance with their knowledge of the wrong-doer's ability to pay."
McKechnie, *supra*, at 288; *see also* 4 William Blackstone's Com-
mentaries *379 (explaining that "the great charter also directs that
the amercement . . . shall be set . . . or reduced to a certainty, by
oath of good and lawful men of the neighbourhood").  In both sub-
stance and procedure, then, the Magna Carta protected an of-
fender's livelihood.   No wonder one eminent legal historian
thought it "[v]ery likely there was no clause in Magna Carta more
grateful to the mass of the people than that about amercements."
F.W. Maitland, *Pleas of the Crown for the County of Gloucester*
xxxiv (1884).

---

[5] The words taken as "position," "trade," and "tillage" in the version of the
Magna Carta that I've quoted have elsewhere been rendered "contenement,"
"merchandize," and "waynage," respectively, and, as that variation suggests,
scholars debate the exact contours of those terms.  *See generally* Nicholas M.
McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive
Fines Clause*, 40 Hastings Const. L.Q. 833, 854–56 (2013).  But all seem to agree
that the Magna Carta forbid an amercement "so large as to deprive [an of-
fender] of his livelihood."  *Browning-Ferris Indus.*, 492 U.S. at 271.

Blackstone confirms that the deprivation-of-livelihood component of the excessiveness inquiry endured across the centuries. In his discussion of the prohibition of excessive fines, he observed that the 1689 "bill of rights was only declaratory of the old constitutional law"—including, of course, the Magna Carta. Blackstone, *supra*, at *377. So, on Blackstone's account, the 1689 Bill of Rights' excessive fines clause carried forward the Magna Carta's provision concerning amercements. *Id.* at *377. Hence, the rule was that "no man shall have a larger amercement imposed upon him than his circumstances or personal estate will bear." *Id.* at *379. Because Blackstone's "works constituted the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), his treatment of the English Bill of Rights of 1689—and its renewal of the Magna Carta's protections of an offender's livelihood—supports an analogous reading of our Eighth Amendment's Excessive Fines Clause.

What's more, Blackstone's understanding accords with sources from colonial America and the early Republic. *See* Nicholas M. McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause*, 40 Hastings Const. L.Q. 833, 866–68 (2013) (collecting sources); *see also* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 330 (2014) ("The principle espoused by the Magna Carta and Blackstone that fines should not permanently impoverish defendants is also found in colonial and early American records."). When William Penn set the metes and bounds of colonial Pennsylvania's government, for instance,

he echoed the language of the Magna Carta: "[A]ll fines shall be moderate, and saving men's contenements, merchandise, or wainage." Pa. Frame of Government § XVIII (1682). Subsequent legislation in the same colony provided for moderate fines as well, "saving men's contenements, merchandise and wainage, which is to say, their furniture of their calling and means of livelihood." McLean, *supra*, at 866 n.128. A proto-constitutional document from New York likewise echoed the Magna Carta's protections against excessive fines. *See* N.Y. Charter of Privileges and Liberties (1683). A century later, legislation in New York did the same. *See* Colgan, *supra*, at 330 (citing a 1787 law requiring that any fine be proportioned to an offense and save to the offender "his or her contenement; That is to say every freeholder saving his freehold, a merchant saving his merchandize and a mechanick saving the implements of his trade"). Given the importance of Virginia's Declaration of Rights to the Eighth Amendment, it's perhaps especially telling that a decision from that state's apex court explained that the Declaration and ensuing legislation provided that a "fine should be according to the degree of the fault *and the estate of the offender*." *Jones v. Commonwealth*, 5 Va. (1 Call.) 555, 557 (1799) (Roane, J.) (emphasis added).

There's good reason to think, then, that when the founding generation ratified a prohibition against "excessive fines," the phrase carried with it an understanding that a fine's excessiveness (or lack thereof) depended on *both* the relationship between the fine and the offense *and* that between the fine and the offender. If

so, the excessiveness inquiry as it stands—in this Circuit, at least—is incomplete.

⋆  ⋆  ⋆

I've written separately to question the degree of deference we give Congress's judgments on the constitutionality of fines it sets. It's not obvious to me that Supreme Court precedent compels, or the Constitution allows, courts to ignore the impact of a fine on an offender's livelihood. And, to the extent that the Excessive Fines Clause requires us to consider precisely that, as I think it well may, returning to the Clause's original meaning would provide a more objective basis for our own judgments—and thereby alleviate any need for undue deference to Congress's.[6]

Perhaps another court in another case will answer those questions. As we—by which I mean the three of us—are not that court and this is not that case, I concur in today's fine opinion.

---

[6] Judge Tjoflat seems to agree with my basic premise. He cites many of the same English, colonial, and Framing-era sources that I do in support of the proposition that an excessive-fines inquiry should account for "both the characteristics of the offender and offense." Tjoflat Concurring and Dissenting Op. at 23. So far, so good. I can't agree, however, with his further "suggest[ion]" that district courts apply the 18 U.S.C. § 3553(a) sentencing factors as "*the test* for excessiveness of civil fines under the Eighth Amendment." *Id.* at 25 (emphasis added). Whatever commonsense appeal Judge Tjoflat's proposal may have as a policy matter, it lacks (so far as I can tell) any firm footing in the text or history of the Excessive Fines Clause.

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part    1

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

I agree that the Excessive Fines Clause is applicable to False Claims Act ("FCA") statutory penalties, but I disagree with the Court's new test for the Excessive Fines Clause as it applies to civil fines.[1] So, I endeavor to lay out, first, why the statute fails to provide a set of standards by which to impose statutory penalties, making an Excessive Fines Clause analysis the only means by which to evaluate the penalty amount. And, second, I will lay out an alternative analysis to the Court's for the Excessive Fines Clause as it applies to civil fines.

## I.

I start from the premise that a district court order without reasoning is arbitrary and therefore unreviewable by us because we have no standards by which to evaluate it. *See Danley v. Allen*, 480 F.3d 1090, 1091 (11th Cir. 2007) ("Many times, and in many contexts, this Court has admonished district courts that their orders should contain sufficient explanations of their rulings so as to provide this Court with an opportunity to engage in meaningful appellate review."); *see also Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007) (explaining that a criminal sentence is

---

[1] I would not reach whether my proposed Excessive Fines Clause test for civil fines also applies to criminal fines. Unlike civil fines, criminal fines are already governed by the Sentencing Guidelines and the factors laid out in 18 U.S.C. §§ 3553(a) and 3572. So, a different test may be required in the criminal fines context.

2  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

procedurally unreasonable when the district court "fail[s] to adequately explain the chosen sentence").

The extent of the District Court's reasoning in this case is that it was bound by our decision in *United States v. Killough*, 848 F.2d 1523, 1533–34 (11th Cir. 1988), which held that the statutory violation penalties under the FCA were mandatory and must be stacked for each violation of the statute. But *Killough* said nothing about how district courts should impose fines within the statutory range set by Congress. Beyond requiring the district court to impose at least the statutory minimum amount for every false claim, *Killough* gives no guidance as to what fine is appropriate. At the time of this case, every claim against Pinellas required, in addition to treble damages, a statutory penalty of between $5,500 and $11,000 per violation.[2] Pinellas cost the Government $755.54 in actual damages, and it submitted 214 false claims. So, the District Court imposed $2,266.62 in treble damages plus $1,177,000 in statutory penalties. The District Court imposed the minimum statutory penalty of $5,500 for each of the 214 false claims. But it provided no legal justification as to why it chose $5,500 within the statutory range of $5,500 to $11,000 per false claim penalty. Presumably, the District Court imposed the statutory minimum fine per violation because it thought that even the statutory minimum fine

---

[2] This number has skyrocketed. As of June 2020, FCA penalties range from $11,665 to $23,331 per violation. *See* 28 C.F.R. § 85.5.

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part    3

was "quite harsh"; but it grounded this determination in no set of standards.

The District Court's damages order reveals an internal problem within the FCA—the FCA provides no guidance as to what considerations district courts should take into account when imposing a fine within the statutory range. To understand how district courts should evaluate FCA fines, we must first turn to the factors district courts must consider in evaluating fines in the criminal context.

## II.

In the criminal law, district courts impose fines based on a set of statutory standards, located in 18 U.S.C. §§ 3553(a) and 3572.[3] These standards are Congress's codification of the traditional purposes of sentencing: general deterrence, specific deterrence or incapacitation, and retribution. *United States v. Scroggins*, 880 F.2d 1204, 1206 (11th Cir. 1989) (explaining the development of the common-law purposes of punishment from the time of the American Revolution to the 1800s). Because the traditional purposes of sentencing guide a district court's discretion in imposing criminal penalties, we, as a reviewing court, have standards by which to

---

[3] Section 3572 is an explication of the § 3553(a) factors as they apply to criminal fines. *See* § 3553(a) (explaining that the court must look at the specific characteristics of the offense and offender in determining the appropriate sentence).

4  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

evaluate a district court's imposition of a sentence of confinement under § 3553(a) or a criminal fine under § 3572.[4]

With that background, I turn to the FCA's statutory scheme. It is a civil penalty system that is "essentially punitive." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784, 120 S. Ct. 1858, 1869 (2000).  Aside from the problems of using a civil lawsuit to effectuate criminal punishment, I have another concern—that essentially criminal penalties are being levied without the protection criminal defendants have when they are being sentenced.  What I mean by this is that the FCA does not direct district courts to consider the traditional purposes of punishment as codified in § 3553(a) and § 3572 when imposing FCA penalties *within* the statutory fine range per violation, nor does it offer an alternative set of standards.

So, without a set of standards, the district court has unfettered discretion to impose any fine within the statutory range.  And that makes imposition of such fines essentially unreviewable for us,

---

[4] In the fines context, the § 3572 factors represent a mix of both general and specific deterrence.  Specific deterrence, also known as incapacitation in the incarceration context, merges with general deterrence in the fines context because what will deter the public at large will necessarily deter the individual who has to pay the fine.  But the individual is not literally incapacitated when he pays a fine, like he would be if he were incarcerated.

20-10276 Tjoflat, J., Concurring in Part and Dissenting in Part    5

except under the Eighth Amendment.[5]  Of course, if a penalty is outside the statutory range, less than the minimum or more than the maximum, we can review that deviation without any governing standards inside the FCA.  But that leads to very limited review and defeats the purpose of making a fine within the statutory range reviewable.

The FCA's standardless penalty scheme is like a return to pre-1984 sentencing.  Prior to the sentencing reforms codified in the Sentencing Reform Act of 1984, we, as the reviewing court, could only disturb a district court's sentence if it was illegal, meaning that it was outside the statutory range, or if it was in violation of the Eighth Amendment. *See United States v. Irey*, 612 F.3d 1160, 1180 (11th Cir. 2010) (en banc) ("Before the Sentencing Reform Act was enacted in 1984, there was practically no appellate review of federal sentences, . . . [and] [s]o long as sentencing judges stayed within the statutory boundaries, they had unbridled discretion to arrive at any sentence they pleased.").  But Congress discarded that approach when it adopted the Sentencing Reform Act.  That Act "channeled and cabined the discretion of sentencing judges by establishing the sentencing guidelines (effective in November 1987) and by specifying factors that had to be considered when imposing a sentence." *United States v. Fowler*, 749 F.3d 1010, 1020–21 (11th Cir. 2014).  Now, even after *United States v. Booker*, 543 U.S. 220,

---

[5] Separately, if a defendant were not allowed by statute to appeal his fine, he would have to collaterally attack the fine under the Eighth Amendment to obtain review.

6  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

125 S. Ct. 738 (2005), district courts must use the guidelines range as an "initial benchmark for their sentencing decisions" and then "must consider the factors set forth in § 3553(a) to determine whether to impose a sentence within or without the guidelines range." *Fowler*, 749 F.3d at 1021 (internal citation and quotation marks omitted).  This is so because "the guidelines remain the lodestone of sentencing."  *Id.* (internal citation and quotation marks omitted).

And now, "post-guidelines sentences are subject to meaningful appellate review for reasonableness."  *Id.* (noting that "if a court elects to impose a sentence based on a major variance from the guidelines range, the chances of reversal on appeal increase").  So, the criminal sentencing context allows for appellate review because the district court must apply standards leading to a result that we can review.  The chances of such a sentence violating the Eighth Amendment are very low because the sentence should have already accounted for a guidelines computation, derived from empirical studies directed to the need of general deterrence and retribution, and the § 3553(a) factors.

But the imposition of civil fines under the FCA is stuck in pre-1984 sentencing, where, based on the statute, we can only hold that a fine is illegal if it departs from the statutory range.  This is certainly at odds with our jurisprudence on review of terms of incarceration and criminal fines, even after *Booker*, and appellate review more generally, which requires standards for evaluation of district court action.  And, without any internal standards for

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part    7

review on the amount of the statutory penalty, we must review the present fine under the Eighth Amendment's Excessive Fines Clause.[6]

## III.

In reaching the Excessive Fines Clause analysis, I feel compelled to first explain why the Court has erred in applying *United States v. Bajakajian*. Forfeitures in the context of criminal proceedings, as in *Bajakajian*, are vastly different from civil fines, as in the FCA, and to apply the same test to both would be to start our Excessive Fines Clause jurisprudence as it applies to civil fines on the wrong foot from the beginning.

In *Bajakajian*, the defendant pled guilty for his failure to report $357,144 that he was planning to take overseas, and the applicable forfeiture statute for the crime of failing to report traveling

---

[6] Judge Jordan misunderstands the purpose of the preceding discussion when he says that "Pinellas has not based its Eighth Amendment Challenge on the procedural claim that the FCA lacks standards." Maj. Op. at 52 n.2. I am not suggesting that Pinellas's Eighth Amendment challenge is based on the lack of standards in the FCA for review of statutory penalties. Notwithstanding the arguments of the parties in this case, I am only pointing out that, unlike in the criminal context, the only method by which we may evaluate statutory penalties in the FCA is the Constitution itself. That seems like an odd arrangement to me, one I felt was worth noting, before diving into the Eighth Amendment analysis. Judge Jordan's second point in footnote 9, *see id.*, is exactly my own. As I explain later, *see infra* Section IV n.19, as a constitutional matter, even the statutory minimum may be too high, and nothing in our precedent suggests that a district court may not dip below that statutory minimum if a constitutional violation is present.

8  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

out of the country with more than $10,000 required that he forfeit the entire amount he was traveling with—all $357,144.  524 U.S. 321, 337–39, 118 S. Ct. 2028, 2038–39 (1998).  In that case, the Supreme Court held that such a forfeiture would be grossly disproportionate to the simple crime of failing to report, especially since the crime was not related to other illegal activities.  *Id.*

In my view, central to *Bajakajian*'s analysis was the common-law roots of forfeiture.  At the time of the framing of the Eighth Amendment, three kinds of forfeiture existed in England: 1) deodand, 2) forfeiture upon conviction for a felony or treason, and 3) statutory forfeiture.  *Austin v. United States*, 509 U.S. 602, 611–12, 113 S. Ct. 2801, 2806–07 (1993).  Each of these forms of forfeiture could be used to punish, and in American law, the third category, statutory forfeiture, took the greatest hold.  *Id.*  In *Bajakajian*, the forfeiture was "imposed at the culmination of a criminal proceeding and require[d] conviction of an underlying felony."  *Bajakajian*, 524 U.S. at 328, 118 S. Ct. at 2033.  The Court determined that the forfeiture was *in personam*, that is, as a result of an individual's criminal conduct, rather than *in rem*, that is, against guilty property.  *Id.* at 331–332, 118 S. Ct. at 2035.  This choice was significant because the Court correlated *in personam* forfeiture with punishment, making that particular forfeiture subject to the Excessive Fines Clause.[7]  *Id.*

---

[7] The Court did note, however, that the inquiry is whether the forfeiture is punitive, not whether the forfeiture is *in personam* or *in rem*, for the purposes of the Excessive Fines Clause analysis.  *See Bajakajian*, 524 U.S. at 332 n.6, 118

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part    9

What is key in all the Court's discussion of forfeiture for pur-
poses of our analysis is the fact that the property at issue in any
form of forfeiture is related to the criminal offense.  If the forfeiture
is *in personam*, the property is related to the individual's criminal
conduct.  If the forfeiture is *in rem* and relates to a criminal matter,
the property has been used in a criminal manner, even if the owner
of the property is innocent.  Either way, the forfeiture is directed at
property directly tied to criminal conduct, and the property for-
feited is directly correlated to the property that was involved in the
criminal offense.  *See Austin*, 509 U.S. at 627–28, 113 S. Ct. at 2815
(Scalia, J., concurring) ("But an *in rem* forfeiture goes beyond the
traditional limits that the Eighth Amendment permits if it applies
to property that cannot properly be regarded as an instrumentality
of the offense—the building, for example, in which an isolated drug
sale happens to occur.  Such a confiscation would be an excessive
fine.  The question is not *how much* the confiscated property is
worth, but *whether* the confiscated property has a close enough

S. Ct. at 2036 n.6 ("It does not follow, of course, that all modern civil *in rem*
forfeitures are nonpunitive and thus beyond the coverage of the Excessive
Fines Clause.  Because some recent federal forfeiture laws have blurred the
traditional distinction between civil *in rem* and criminal *in personam* forfei-
ture, we have held that a modern statutory forfeiture is a 'fine' for Eighth
Amendment purposes if it constitutes punishment even in part, regardless of
whether the proceeding is styled *in rem* or *in personam*.  *See Austin v. United
States*, *supra*, at 621–622, 113 S.Ct., at 2811–2812 (although labeled *in rem*, civil
forfeiture of real property used "to facilitate" the commission of drug crimes
was punitive in part and thus subject to review under the Excessive Fines
Clause).").

10  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

relationship to the offense." (emphasis in original)).  And, in the case of *in personam* forfeiture, as in *Bajakajian*, the forfeiture was related to a criminal sentence that could include imprisonment and a fine under the applicable statute.  *Bajakajian*, 524 U.S. at 338, 118 S. Ct. at 2038.

From *Bajakajian*, we derived a three-factor test to determine whether a forfeiture is grossly disproportional to the gravity of a defendant's offense.  *See United States v. Browne*, 505 F.3d 1229, 1281 (11th Cir. 2007).  We explained that in these cases we examine "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant."  *Browne*, 505 F.3d at 1281 (internal citation omitted).  We later clarified, in *United States v. Chaplin's, Inc.*, that these factors do not represent an "exclusive checklist," 646 F.3d 846, 851 n.16 (11th Cir. 2011), and that we apply a "strong presumption" of constitutionality when the forfeiture is below the maximum criminal statutory fine, *id.* at 852 (citing *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999).

*Bajakajian* was tailored to the context of forfeiture.  Forfeiture's deep common-law roots make it distinct from the FCA's civil fines regime, and I think this difference makes the test we developed in *Browne* (from *Bajakajian*) inapplicable to the present case.  *Cf. Austin*, 509 U.S. at 627, 113 S. Ct. at 2814 (Scalia, J., concurring) ("[I] think it worth pointing out that on remand the excessiveness

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part  11

analysis [for *in rem* forfeitures] must be different from that applicable to monetary fines and, perhaps, to *in personam* forfeitures."). Here, in the FCA context, there is no natural limit to the fine extracted, like there is a natural limit to the property forfeited based on its involvement in criminal activity. And, because the criminal fine at issue in *Bajakajian* was *in personam*, that is, based on the defendant's criminal conviction, the Court could compare the forfeiture amount to how culpable Congress thought the conduct was under the criminal scheme. In addition, the Guidelines inherently consider specific deterrence, general deterrence, and retribution. *See Scroggins*, 880 F.2d at 1209 ("Thus, while the guidelines consider evidence of the offender's criminal history for purposes of punishment and general deterrence, its primary importance is to ensure that the specific defendant is deterred from future criminal conduct.").

I take issue with the Court's treatment of both the second *Browne* factor, derived from *Bajakajian*, and the strong presumption of constitutionality because neither has a place in the FCA context. The second *Browne* factor directs the court to analyze "other penalties authorized by the legislature (or the Sentencing Commission)." *Browne*, 505 F.3d at 1281. Undoubtedly, the Court today evaluates other penalties authorized by the legislature, but it evaluates the *wrong* penalties. The Court goes outside the FCA statutory scheme to compare the FCA fines to the fines of such statutes as civil RICO, the Clayton Act, federal aviation laws, and the Anti-Kickback Act. *See* Maj. Op. at 49–51.   But that analysis

12  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

misinterprets the second *Browne* factor.  As *Bajakajian's* analysis makes clear, a court must look *within* the statutory scheme in evaluating what other penalties are authorized for the *same* offense. *Bajakajian*, 524 U.S. at 338, 118 S. Ct. at 2038 (focusing on the Sentencing Guidelines (pre-*Booker*) and explaining that while the applicable forfeiture statute required forfeiture of the entire $357,144 the maximum period of incarceration that could have been imposed under the guidelines for the crime of failing to report the currency was six months with a maximum fine of $5,000).  The purpose of looking within the statutory scheme is to figure out how culpable Congress considered the conduct at issue to be.  *Id.* at 339, 118 S. Ct. at 2038 (explaining that in Bajakajian's case, "such penalties confirm a minimal level of culpability").

The Court's method of comparing FCA penalties to other statutory schemes is like comparing apples and oranges.  And figuring out how culpable Congress thinks an orange is tells us nothing about how culpable it thinks an apple is.  In fact, the Court's method reveals how little room district courts have to maneuver in imposing fines under the FCA.  The district court must impose treble damages and statutory penalties, with no discretion to craft a tailor-made sentence.  This is not like the flexibility in criminal sentencing afforded to district courts, which often have statutory fines, statutory sentencing ranges, and guidelines ranges as guides when imposing punishment.  This difference between the criminal context and FCA fines leads me to believe that the second *Browne* factor is totally inapplicable to the FCA context.  Today's decision

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part  13

is precedential because we are deciding to apply the Excessive Fines Clause to FCA fines.  On this blank slate, I would hesitate to apply a wooden analysis of the second *Browne* factor without accounting for the differences between forfeitures associated with criminal convictions and civil fines.

Next, I turn to the Court's application of the strong presumption of constitutionality.  *Chaplin's* tells us that when a forfeiture is below *the statutory maximum criminal fine*, we give that forfeiture a strong presumption of constitutionality.  646 F.3d at 842.  Congress determines how culpable the conduct is, and a comparison of the forfeiture amount to the fine amount allowed by statute is one way of measuring culpability.  This is because the criminal fine amount is the product of Congress weighing the traditional purposes of punishment in crafting sentences.  "Congress, as a representative body, can distill the monetary value society places on harmful conduct," and "[t]he Sentencing Guidelines reflect institutional expertise and monetize culpability with even greater precision than criminal legislation."  *Chaplin's, Inc.*, 646 F.3d at 852 (internal citation and quotation marks omitted).  But the strong presumption of constitutionality should only apply when Congress and/or the Sentencing Commission bring their expertise to bear.  And, here, there is no indication of how culpable either body thought the false claims were by any other measure than the fine itself, unlike in the forfeiture context, where the

14  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

criminal fine guides the forfeiture analysis.[8]  For sure, the legislative reports surrounding the 1986 amendments to the FCA suggest that the fines were aimed at deterrence.  H.R. Rep. No. 99-660, at 20 (1986) ("The Committee recommends this change in order that the False Claims Act penalties will have a strong deterrent effect.").  But evaluation of deterrence should be tied to evidence of what will, in fact, most efficiently deter.  *See* § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the" traditional purposes of punishment.").  That is, Congress should want to make the costs of doing the prohibited activity higher than not doing it.  But just how much higher the costs should be is a matter of legislative determination.  The circumstances of the case will have a bearing on efficient deterrence.  If a child steals a candy bar, a $100 fine and a $1,000 fine will both deter the child, but the $1,000 fine would probably be disproportionate to the offense.  So, the $100 fine is probably more appropriate.

---

[8] The strong presumption of constitutionality is premised on "two very competent bodies," Congress and the Sentencing Commission, "[t]ranslating the gravity of a crime into monetary terms."  *817 N.E. 29th Drive*, 175 F.3d at 1309.  Specifically, the guidelines "are the product of extensive research, though, input from commentators, and experience," and "[t]hey are designed to proportion punishments to crimes with even greater precision than criminal legislation."  *Id.* at 1310; *see also* 28 U.S.C. § 994 (explaining the many considerations, including the § 3553(a) factors, the Commission must take into account when determining guidelines ranges).  None of these protections apply in the FCA context, and the need for us to evaluate Congress's work becomes greater in the absence of such protections.

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part 15

The FCA covers a vast swath of conduct, from solo practice medical clinics sending in false Medicare claims to government contractors defrauding the Government of millions of dollars. *See* S. Rep. No. 110-507, at 3–4 (2008) (discussing the impetus behind the 1986 Amendments to the False Claims Act and "widespread" fraud against the Government (internal citation omitted)). Of course, the commonality is that all False Claims Act cases involve—well—false claims. But the sheer permutations of false claims violations falling under the FCA precluded Congress from "distill[ing] the monetary value society places on harmful conduct"[9] or "monetize[ing] culpability" under the statutory fine scheme.[10] *Chaplin's, Inc.*, 646 F.3d at 852. A solo doctor could submit 50 false claims in Medicare fraud that only cost the Government $500. A Government contractor could submit 50 false claims that cost the Government $5 million. In both cases, the statutory minimum and maximum fine range would be the same, even though the treble damages amounts would be vastly different and the cost to society would likely be much higher in the case of Government contractor fraud. My point is that the statutory fine ranges are not at all tethered to what will efficiently deter a

---

[9] While monetary recoveries "represent a victory for American taxpayers, they are only one measure of the fraud against the Government. As the GAO pointed out, fraud erodes public confidence in the Government's ability to efficiently and effectively manage its programs." S. Rep. No. 110-507, at 8.

[10] "Complexity of subject matter should never preclude the Government from uncovering fraud, but, unfortunately, it is impossible to determine how much fraud goes undetected." S. Rep. No. 110-507, at 8.

16  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

particular defendant based on evidence, so the strong presumption of constitutionality is unwarranted in the FCA fine context.

## IV.

Having explained why the *Bajakajian* analysis is inapplicable to the civil fines context, I now turn to what I deem to be a more sensible approach to evaluating civil fines under the Eighth Amendment.

Our Eighth Amendment has a distinguished lineage.  In 1215, Magna Carta directed that "[a] Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement."[11]

---

[11] "Lord Coke believed that the Magna Charta's protections against excessive amercements were 'made in the affirmance of the common law.'"  Calvin Massey, *The Excessive Fines Clause and Punitive Damages: Some Lessons from History*, 40 Vand. L. Rev. 1233, 1251 (1987) (citing 2 E. Coke, The Institutes of the Laws of England *27–28).  Prior to Magna Carta, legal writers were espousing the principle of proportionality.  *See id.* at 1251 (quoting Glanvill who wrote in the late twelfth century).  It is worth noting that Magna Carta only applied to amercements and not fines, but the later 1689 English Bill of Rights applied to both amercements and fines.  *See id.* at 1252–53.  But, since an amercement "was a financial penalty payable to the crown or its representative," for either a civil or criminal misdeed, *id.* at 1252, it serves as a common-law analog to the modern FCA fine.  In contrast, fines at common law were "voluntary offering[s] made to the king to avoid royal displeasure or obtain some favor."  By the eighteenth century, the distinction between these two schemes vanished.  *Id.* at 1264.  For our purposes, common-law amercements serve an important role in deciphering the original meaning of the Excessive Fines Clause because they most closely mirror the civil fines of the FCA.

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part 17

§ 20, 9 Hen. III, ch. 14, in 1 Eng. Stat. at Large 5 (1225). The baseline for amercements and fines under Magna Carta was proportionality to the wrong committed and to the defendant's ability to pay. *See Timbs v. Indiana*, 139 S. Ct. 682, 688 (2019) (citing *Browning-Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 271, 109 S. Ct. 2909, 2918 (1989)). Because abuses abounded under the Stuart kings in the seventeenth century, the English Bill of Rights of 1689 picked up on Magna Carta's language and directed that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." 1 Wm. & Mary, ch. 2, § 10, in 3 Eng. Stat. at Large 441 (1689). Ultimately, that language was incorporated into the Virginia Declaration of Rights[12] and then into our Eighth Amendment. *See Timbs*, 139 S. Ct. at 688–89; *see also* Calvin Massey, *The Excessive Fines Clause and Punitive Damages: Some Lessons from History*, 40 Vand. L. Rev. 1233, 1241 (1987) (noting that there was little debate over the Eighth Amendment and explaining that it is likely that the First Congress "uncritically accepted the language [of the Excessive Fines Clause], treating it as

---

[12] *See* Allan Nevins, *The American States During and After the Revolution, 1775-1789* 146 (1924) (explaining that the Virginia Declaration of Rights "was a restatement of English principles—the principles of Magna Charta . . . and the Revolution of 1688"); *see also Solem v. Helm*, 463 U.S. 277, 286, 103 S. Ct. 3001, 3007 (1983) ("Although the Framers may have intended the Eighth Amendment to go beyond the scope of its English counterpart, their use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection—including the right to be free from excessive punishments.").

18  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

a shorthand expression for ancient rights rooted in the soil of English law").

The prohibition of excessive fines "has been a constant shield throughout Anglo-American history." *Timbs*, 139 S. Ct. at 689. One example of the need for the Excessive Fines Clause is that "[e]ven absent a political motive, fines may be employed 'in a measure out of accord with the penal goals of retribution and deterrence,' for 'fines are a source of revenue,' while other forms of punishment 'cost a State money.'" *Id.* (citing *Harmelin v. Michigan*, 501 U.S. 957, 978 n.9, 111 S. Ct. 2680, 2693 n.9 (opinion of Scalia, J.) ("it makes sense to scrutinize governmental action more closely when the State stands to benefit")).[13]

What is key from this statement in *Timbs* is that the Court is looking at the traditional purposes of punishment—retribution and deterrence—in evaluating the Excessive Fines Clause, now codified in § 3553(a). This makes sense because the Eighth Amendment was not written on a blank slate. The venerable history of the Eighth Amendment, tracing back from Magna Carta, should inform how we view the content of the Eighth Amendment.

---

[13] Because the "Excessive Fines Clause was drafted in an era in which the amount of a fine was determined solely by the judiciary" and "the Clause was thus intended as a limitation on courts, not legislatures," it falls on us to scrutinize fine schemes, especially where there is no indication that Congress filtered these fines through the § 3553(a) factors as it would have done in the criminal context. *United States v. 817 N.E. 29th Drive*, 175 F.3d at 1309 n.8.

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part  19

We know that at common law, "colonial courts fashioned sentences with three basic purposes in mind: to punish the offender for his crime, thereby satisfying society's desire for retribution ('punishment'); to deter others from committing the same crime by demonstrating its disadvantageous consequences ('general deterrence'); and to incapacitate the wrongdoer, so as to protect society from further criminal activity ('specific deterrence' or 'incapacitation')." *Scroggins*, 880 F.2d at 1206. In light of these common-law goals and the Eighth Amendment's incorporation of the common law, our first goal should be to figure out how the historical common law—from Magna Carta to our Constitution—viewed the traditional purposes of punishment in the context of excessive fines.

In the 1600s, Sir Edward Coke described Magna Carta as "but a confirmation or restitution of the Common Law." 1 Edward Coke, Institutes of the Lawes of England (1608), *reprinted in* 2 *The Selected Writings and Speeches of Sir Edward Coke* § 108, at 697 (Steve Sheppard ed., 2003); *see generally* Brief of Professor John F. Stinneford as Amicus Curiae in Support of Neither Party, Kahler v. Kansas, 140 S. Ct. 1021 (2019) (No. 18-6135).  And the English common law interpreted Magna Carta as requiring that fines be "reasonable and proportional." Brief of Stinneford, at 9; *see Richard Godfrey's Case*, 11 Co. 42a, 44a., 77 Eng. Rep. 1199, 1202 (1615) (explaining that "the reasonableness of the fine shall be adjudged by the justices; and, if it appears to them to be excessive, it is against

20  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

the law, and shall not bind.").[14]  Under Magna Carta, "imprison-
ment ought always to be according to the quality of the offence."
*Hodges v. Humkin*, 2 Bulst. 139, 140, 80 Eng. Rep. 1015 (1615).

Although there is some debate about the impetus for the
1689 English Bill of Rights, most scholars agree that it was neces-
sary because of the Stuart kings' drift away from the principles of
Magna Carta during the late 1600s.  By this time, the idea of exces-
sive fines had come to incorporate the principle that the punish-
ment imposed should be in keeping with the traditional common-
law sentence for that particular crime.  *See Harmelin*, 501 U.S. at
973–74, 111 S. Ct. at 2690 (explaining that during the 1600s in Eng-
land "a punishment [wa]s not considered objectionable because it
[wa]s disproportionate, but because it [wa]s out of the Judges'
Power, contrary to Law and ancient practice, without Precedents
or express Law to warrant, unusual, illegal, or imposed by Pretence
to a discretionary Power" (internal quotation marks and citation
omitted)).  So, during this period, too, the common law was the
bedrock of sentencing.[15]

---

[14] *Godfrey's Case* draws from both the law of amercements and fines in deter-
mining whether the particular fine in that case was excessive.  *See* 77 Eng. Rep.
at 1202.

[15] *Harmelin* seems to question whether the historical Excessive Fines Clause
analysis more properly looks at proportionality or legality.  In other words,
*Harmelin* creates a distinction as to whether the common-law excessive fines
analysis would have looked at a sentence's departure from the common-law
sentence or a sentence's lack of proportionality to an offense for determining
excessiveness.  501 U.S. at 973, 111 S. Ct. at 2690.  I believe this is a false

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part 21

With that background, I turn to Blackstone's Commentaries. The Supreme Court has described Blackstone's Commentaries as "more read in America before the Revolution than any other law book." *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 151, 63 S. Ct. 499, 509 (1943); *see also Schick v. United States*, 195 U.S. 65, 69, 24 S. Ct. 826, 827 (1904) ("Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the adoption of the Federal Constitution, it had been published about twenty years, and it has been said that more copies of the work had been sold in this country than in England; so that undoubtedly, the framers of the Constitution were familiar with it.").[16]

---

dichotomy. Presumably, the common-law sentencing regime naturally incorporated proportionality and the traditional purposes of punishment. So, a departure from the common-law regime would necessarily be a departure from proportionality. There may be a time when we think a common-law punishment is disproportionate to an offense, and thus applying the legality test for excessiveness may yield a different outcome from the proportionality test. But I think such an instance would be rare and would only reflect that the common law itself has departed from the traditional purposes of punishment. *Cf. Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 2021 (2010) ("For the most part, however, the Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime. The concept of proportionality is central to the Eighth Amendment.").

[16] And from its inception to the present, the Supreme Court has relied on Blackstone to understand how the framers viewed the common law. *See, e.g.*, *Chisolm v. Georgia*, 2 U.S. (2 Dall.) 419, 442–43, 1 L.Ed. 440 (1793) (extensively quoting Blackstone to determine the contours of sovereign immunity prior to the enactment of the Eleventh Amendment); *Marbury v. Madison*, 5 U.S. (1

22  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

Blackstone had much to say about whether a fine is excessive.  His commentaries explain that "[t]he reasonableness of fines in criminal cases[17] has also been usually relegated by the determination of Magna Carta, concerning amercements for misbehavior in matters of civil right."  Blackstone took his view from the language of the Magna Carta as follows: "Liber homo non amercietur pro parvo delicto, nisi secundum modum ipsius delicti; et pro magno delicto, secundum magnitudinem delicti; salvo contenemento suo: et mercator eodem modo, salva mercandisa sua; et villanus eodem modo amercietur, salvo wainagio suo."  4 William

Cranch) 137, 147–48, 2 L.Ed. 60 (1803) (looking to Blackstone to define a writ of mandamus); *United States v. Wong Kim Ark,* 169 U.S. 649, 659, 18 S. Ct. 456, 461 (1898) (using Blackstone to define the right of citizenship in the United States under the Citizenship Clause); *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 151, 63 S. Ct. 499, 509 (1943) (calling on Blackstone to carve out the contours of admiralty jurisdiction); *United States v. Hayman*, 342 U.S. 205, 221 n.35, 72 S. Ct. 263, 273 n.35 (1952) (using Blackstone to expound on the meaning and breadth of habeas corpus); *Morissette v. United States*, 342 U.S. 246, 251, 72 S. Ct. 240, 244 (1952) (equating Blackstone's view of intent with the English common law and American common law); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019) (turning to Blackstone to explicate the original meaning of the Eighth Amendment's Cruel and Unusual Punishments Clause).

[17] Although Blackstone singles out criminal cases, the protection against excessive fines in the English Bill of Rights of 1689 "included more than protection from criminal fines; it also provided a great deal of protection with respect to civil fines [i.e., amercements]."  Calvin Massey, *The Excessive Fines Clause and Punitive Damages: Some Lessons from History*, 40 Vand. L. Rev. 1233, 1275 (1987).  And since FCA fines are essentially punitive in nature, serving the same purpose as criminal fines at common law, I do not hesitate to apply Blackstone's analysis here.

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part 23

Blackstone's Commentaries *379 (Lewis ed. 1902) (internal quotation marks omitted).   Blackstone summarized that "no man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear: saving to the landholder his contenement, or land; to the trader his merchandise; and to the countryman his wainage, or team and instruments of husbandry." *Id.*

In short, Blackstone's Commentaries look at both the characteristics of the offender and offense in determining the appropriate fine.   *Cf.* § 3553(a)(1) (explaining that the court must look at "the nature and circumstances of the offense and the history and circumstances of the defendant" in imposing a sentence).   And the principle of proportionality based on the offense and the defendant's ability to pay was embodied in the common law as evidenced by how states interpreted their own excessive fines clauses.   *See Steptoe v. The Auditor*, 24 Va. 221, 234 (Va. 1825) (describing a law and explaining that "[i]t would be *excessive*, as bearing no proportion whatever to the nature of the offence, not even graduated by the amount due" (emphasis in original)); *Commonwealth v. Morrison*, 9 Ky. 75, 99 (Ky. 1819) ("The fine imposed should bear a just proportion to the offense committed, the situation, circumstances and character of the offender.  That proportion must be ascertained by the sound discretion of the court: a flagrant transcension by the legislature in fixing the fine of that just relative proportion between offense and fine, would be denominated excessive."); *cf.* § 3572 (directing the court to look at the "defendant's income, earning

24  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

capacity, and financial resources" in determining the appropriate criminal fine).

This proportionality analysis tracks the traditional purposes of punishment of general deterrence, specific deterrence, and retribution. Blackstone, quoting Montesquieu, explained that "excessive severity of laws [out of proportion to the offense] . . . hinders their execution." 4 William Blackstone's Commentaries *17; cf. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the" traditional purposes of punishment); § 3553(a)(2)(A) (explaining that a sentence should "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense"). And he defined excessiveness in relation to laws that do not have "due distinctions of severity," with the common law as the baseline. Id. American common law, incorporating the traditional purposes of punishment, tracks this reasoning. See, e.g., Barker v. People, 3 Cow. 686, 694 (N.Y. 1824) (looking at the common law to determine what kinds of punishment were unusual for purposes of the state's version of the Eighth Amendment); Jones v. Commonwealth, 5 Va. 555, 558 (Va. 1799) (determining that a joint fine was excessive because the common law forbade such fines); see also Johnson v. Tompkins, 13 F. Cas. 840, 848 (E.D. Pa. 1833) ("Here [in Pennsylvania] punishment is graduated in proportion to the enormity of the offence, and cruel punishments are expressly forbidden by the constitution, as well as excessive fines (article 9, § 13) and by the eighth amendment to the constitution of the United States.");

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part  25

*Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (focusing on the common-law limits to corporal punishment in the Eighth Amendment context).

In other words, at common law, the inquiry into excessiveness hinged on an analysis of an individual defendant with individual characteristics and an individual crime. *Cf.* § 3553(a). The common-law analysis of the Eighth Amendment, therefore, mirrors the evaluation of the traditional purposes of punishment, as they are codified in § 3553(a). So, it makes sense that if the Eighth Amendment incorporates the common law and its traditional purposes of punishment, and the common law performed an individual analysis for excessiveness, that we too should opt for a particularized analysis for excessive fines.

I suggest that district courts should apply the § 3553(a) factors (and thus the § 3572 factors) to the FCA context as the test for excessiveness of civil fines under the Eighth Amendment.[18] To do

---

[18] Judge Newsom takes issue with my suggestion that the § 3553(a) factors be used as a way of implementing the constitutional standard for excessiveness because this approach "lacks (so far as [he] can tell) any firm footing in the text or history of the Excessive Fines Clause." Newsom Op. at 14 n.6. I find this criticism unavailing. Judge Newsom signs on to the Court's opinion applying the *Browne* factors (derived from *Bajakajian*) to the civil fines context. The *Browne* factors, by that name, are nowhere in the common-law history of the Excessive Fines Clause, so the same critique could be leveled against them. But their goal is to distill the common-law purposes of punishment into a test that respects the original meaning of the Eighth Amendment. Both the Court's opinion today and my own approach are simply implementing doctrines, not the Constitution itself, based on the common law. My approach, the

26  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

so would be to create a set of standards for district courts to apply that accords with common law, and it would give us something to review on appeal.  In practice, district courts would hold evidentiary hearings to allow the defendant, pulling from the §§ 3553(a) and 3572 factors, to explain why the purposes of punishment—i.e., retribution, general deterrence, and specific deterrence—are not served by the penalty the Government (or qui tam relator) seeks to impose.

The constitutional analysis for excessive fines puts the burden on the defendant bringing the constitutional challenge to provide evidence as to how the proposed statutory penalty fails to accord with the traditional purposes of punishment.  The defendant's goal would be to show that the fine is disproportionate to the offense.  And the Government may respond with evidence of its own to rebut the defendant's challenge.  The district court's task is to assess the evidence before it and determine how the characteristics of the offense and the characteristics of the offender correspond to the fine in question.  *See* William Blackstone's Commentaries *15–16 ("To kill a man upon sudden and violent resentment is less penal, than upon cool deliberate malice.  The age, education, and character of the offender; the repetition (or otherwise) of the offense; the time, the place, the company wherein it was committed;

---

application of the § 3553(a) factors as the Excessive Fines Clause test for civil fines, takes account of the fact that the § 3553(a) factors are just an adoption of the common-law purposes of sentencing and reflect the policy underpinnings of punishment throughout our nation's history.

20-10276 TJOFLAT, J., Concurring in Part and Dissenting in Part 27

all these, and a thousand other incidents, may aggravate or extenuate the crime."). The best way for the district court to follow the common-law model is to evaluate the § 3553(a) factors.

Section 3572 is simply an explication of the § 3553(a) factors. It directs the district court to look at factors like the defendant's income, the burden the fine would impose on the defendant or his dependents, the harm caused by the defendant, how much restitution is made, the need to take away from the defendant illegal profit, and the costs to the government of the defendant's misconduct. These are exactly the kind of factors that common-law courts considered when imposing a fine, and they serve as the ideal guide for today's district courts when trying to conduct an Eighth Amendment analysis for excessive fines. In other words, the Excessive Fines Clause analysis should be holistic, considering all the individual facts of the case, not a wooden application of *Bajakajian*.

It is worth noting that, in reviewing the evidence, even the statutory minimum penalty is in clear focus, and the district court might find that based on the evidence before it even the statutory minimum range is too high. In the event that the district court finds that the statutory minimum range is excessive in relation to the offense, it may lower the fine amount to correspond to the traditional purposes of punishment and must provide a reasoned explanation as to how it came to that determination.[19] This also goes to

---

[19] The District Court seemed to believe that *Killough* prevented it from making the fine less than the minimum statutory fine per claim. *See also United States v. Bornstein*, 423 U.S. 303, 313, 96 S. Ct. 523, 529 (1976) (assuming that

28  TJOFLAT, J., Concurring in Part and Dissenting in Part  20-10276

reviewability because such a reasoned explanation allows us to evaluate the district court's reasoning and usage of the § 3553(a) factors in the constitutional analysis.

And, in 1998, the Supreme Court confirmed that proportionality is the "touchstone" of the Excessive Fines Clause. *Bajakajian*, 524 U.S. at 334, 118 S. Ct. at 2036. And using the traditional purposes of punishment as a set of guideposts honors the tradition of proportionality because it considers the characteristics of the offender and the characteristics of the offense in each case. I would remand so that the District Court could allow the defendant to present evidence on both the characteristics of the offense and the offender. To do otherwise would be to allow an arbitrary fine to stand under the Excessive Fines Clause.

---

statutory fines would be stacked outside the Eighth Amendment context). But *Killough* only clarified how statutory fines should be assessed under the FCA. *See Killough*, 848 F.2d at 1533. It did not say anything about how the Excessive Fines Clause interacts with the statutory scheme. *Killough* does not prevent a defendant from bringing an as-applied constitutional challenge to even the minimum statutory fine amount based on Excessive Fines Clause grounds. On a separate note, *Killough* adopted the Seventh Circuit view that "imposition of forfeitures under the Act is not discretionary, but is mandatory for each claim found to be false." *Id.* (citing *United States v. Hughes*, 585 F.2d 284, 286 (7th Cir. 1978)). That is, according to *Killough*, penalties must be stacked as a statutory matter. However, *Killough* was not considering stacking based on a constitutional challenge, and I suggest that in another case stacking could be challenged on Eighth Amendment as-applied grounds in the same way that the amount per violation could be challenged.